UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FREDERICK M. CARGIAN,

                        Plaintiff,

    against                                                                              **15 CV 01084 (GBD)(HP)**

BREITLING, USA, INC.,

                        Defendant.

---

**PLAINTIFF'S CORRECTED MEMORANDUM OF LAW IN OPPOSITION TO**

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Janice Goodman**
**Law Offices of Janice Goodman**
**Attorney for Plaintiff**
**233 Broadway, Suite 2704**
**New York, NY 10279**
**(212) 869-1940**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ......................................................................................................1

   A.   1990 THROUGH 2010 ..............................................................................................1

   B.   THE PRISSERT ERA: ESTABLISHMENT OF UNREALISTIC GOALS ....................................3

   C.   REPLACEMENT BY AN UNQUALIFIED YOUNG MAN..........................................................5

   D.   BOYS CLUB ATMOSPHERE/PLAINTIFF TREATED LIKE ONE OF THE "GIRLS"...............9

   E.   UNFAIR DISCIPLINARY TREATMENT .......................................................................11

ARGUMENT ...................................................................................................................13

APPLICABLE LEGAL STANDARDS........................................................................................13

   POINT I: SUMMARY JUDGMENT STANDARDS.........................................................................15

   POINT II: DEFENDANT HAS NOT CARRIED ITS BURDER OF PROOF ON SUMMARY

   JUDGMENT ....................................................................................................................17

     A.  AGE CLAIM UNDER ADEA AND NYSHRL and NYCHRL ..................................17
     B.  GENDER DISCRIMINATION ...............................................................................19
       1.  TITLE VII...........................................................................................19
       2.  SEX ORIENTATION DISCRIMINATION UNDER THE STATE AND CITY LAWS .........22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Baldwin v Fox*, 2015 WL 4397641 (July 16, 2015) .................................................................20

*Brady v. Town Colchester*, 863 F.2d 205 (2d Cir. 1988) ......................................................13

*Brennan v Metro. Opera Ass'n. Inc.*, 174 F. 3d 310 (2d Cir. 1999) .........................................16

*Bryan v. Chemical Bank*, 617 F. Supp. 1070 (S.D.N.Y. 1985) ...............................................19

*Bryson v. Chicago State Univ.* 96 F. 3d 912, 917 (7th Cir. 1996)..........................................22

*Bucalo v. Shelter Island Union Free School Dist.*, 691 F. 3d 119 (2d Cir. 2012)..................................16,17

*Chambers v. TRM Copy Ctrs. Corp.*, 43 F. 2d 29 (3d Cir. 1994) ...........................................17

*Chevron, U.S.A. Inc. v. Natural Resources Defense Council Inc.*, 467 U.S. 837 (1984)..........................20

*Christiansen v Omnicom Group*, Inc. 2016 WL 951581 (S.D.N.Y. March 9, 2016).......................................21

*Delany v Bank of America Corp*, 766 F. 3d 163, 169 (2d Cir. 2014)..........................................17

*Ferrante v American Lung Ass'n*, 90 NY 2d 623, 687 N.E. 2d 1308 (N.Y. 1997)...........................14

*Fowlkes v. Ironworkers Local 40*, 790 F. 3d 378 (2d Cir. 2015) ...........................................21

*Holcomb v Iona College*, 521 F. 3d 130 (2d Cir. 2008) ......................................................14

*Howley v. Town of Stratford*, 217 F. 3d 141 (2d Cir. 2000)..................................................14

*Isaacs v. Felder Servs. LLC*, 2015 WL 6560655* 3 (M.D.A.L.A. Oct 29, 2015) ...............................20, 21

*Luciano v. Olsten Corp.*, 110 F. 3d 210 (2d Cir. 1997) ......................................................14

*Macy v Holder*, 2012 EEOPUBLEXIS 1181 (E.E.O.C.Apr.20, 2012.)........................................21

*Mahalik v Credit Agricole Cheuvreux No. America*, 715 F. 3d 102 (2d Cir. 2013) ...................................16

*McDonald v. Santa Fe Trail Tans. Co.*, 427 U.S. 273 (1976)..................................................25

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)..................................................16, 21

*Melman v Montefiore Medical Center*, 946 NYS 2d 27 (1st Dept. 2012) ...................................16

*Obergefell v Hodges*, 135 S. Ct. 2584 (2015) ........................................................................ 21

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998) .................................... 19, 20

*Phillips v Martin Marietta Corp.*, 400 U.S. 542 (1971) ............................................................ 23

*Price Waterhouse v Hopkins*, 490 U.S. 228 (1989) ................................................................ 19

*Ramseur v. Chase Manhattan Bank.* 865 F.2d 460 (2d Cir. 1989) ......................................... 14

*Reeves v Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) ................................... 3, 13

*Richard v. N.Y.C. Dept. of Ed.*, 2015 WL 4164746 (S.D.N.Y. July 10, 2015) ........................ 16

*Rosen v. Thornburgh,* 928 F2d 528 (2d. Cir. 1991) ........................................................... 14, 23

*Simonton v Runyon*, 232 F 3d. 33 (2d Cir. 2000) .................................................................... 19

*Skidmore v Swift & Co.*, 323 U.S. 134 (1944) ....................................................................... 20

*St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502 (1993) ............................................................. 19

*Twomey v QuadGraphics, Inc.*, 2015 WL 5698002 (S.D.N.Y. Sep. 28 2015) ......................... 16

*U. S. v Windsor*, 133 S. Ct. 2675 (2013) ................................................................................ 21

*Vega v. Hempstead Union Free School District,* 801 F. 3d 72 (2d Cir. 2015) ......................... 14

*Zakre v. Noddeutsche., Inc.* 942 F. Supp (S.D.N.Y. 1996) ...................................................... 22

## Statutes

Title VII of The Civil Rights Act of 1964, 42 U.S.C.§§ 2000 et seq. ........................................ 3

Age Discrimination in Employment Act, 29 U.S.C.§ 621 et seq. ......................................... 1,15

Administrative Code of the City of New York Secs 8-107 et seq. ............................................. 3

Local Civil Rights Restoration Act of 2005, Local Law No. 85[2005] .................................... 19

New York State Human Rights Law, N.Y. Exec. Law Sec 296 ....................................... 1, 3, 19

## Other Authorities

Gertner, Nancy, "Losers Rule", The Yale Law Journal Online 122:109, 2012 ......................... 15

## PRELIMINARY STATEMENT

After 23 years as Breitling USA's leading sales representative in the United States, Plaintiff, Frederick M. Cargian, a gay man, was fired effective December 31, 2012, at age 53. After years of success, a new boss Thiery Prissert ("Prissert"), came in, who established practices calculated to assure plaintiff's failure.  He created a "boy's club" atmosphere, excluding the "girls," a group in which he included Cargian, from his inner circle; imposed higher unobtainable sales budgets for Cargian than for any other rep; subjected Cargian to reprimand even when no policy was violated; treated Cargian more harshly and with less due process in a disciplinary matter than a straight man who admittedly falsified business reports; demoted Cargian in function and salary, promoting a 33 year old straight man with no prior sales experience to take over his responsibilities; and, predictably, fired plaintiff in order to promote a significantly younger, less qualified straight man.

On  February 17, 2015 , Cargian filed this action to remedy discrimination against him because of his gender, sexual orientation and age in violation of the Civil Rights Act of 1964, 42 U.S.C.§§ 2000e et seq. ("Title VII"); the Age Discrimination in Employment Act ("ADEA"), 296 et seq. ("ADEA"); the New York State Human Rights Law, N.Y. Exec. Law Sec 296 et seq. ("NYSHRC"); and the Administrative Code of the City of New York Secs 8-107 et seq.

## STATEMENT OF FACTS

### A.  1990 THROUGH 2010[1]

Cargian was hired by Marie Bodman ("Bodman"), President of Breitling, in February 1990 as its National Training Manager.  In 1992, he was promoted to Regional Sales Representative while still performing his responsibilities as Training Manager.  In about 1995 or

---

[1] See generally plaintiff's affidavit for background information.

1996 he was relieved of the training responsibilities to become a full time rep.  Cargian Aff. ¶¶ 3-13, Ex. A.    At the time of hire, Breitling, a Swiss manufacturer of high end watches, had a minimal presence in the United States.  There were about 6 or 7 staff employees and a book of business of between $2 -$4 million.  Over the years the staff grew to 140 and business to $100M. From the late 90s to 2010, plaintiff was the leading salesman increasing sales over the prior years from between 15% to 46%, and surpassing goals, sometimes by 118%-130%.  2008 and 2009 were the recession down years for all, plaintiff rebounded in 2010 when he was again the highest producer increasing his sales by 40%.  Plaintiff's 56.1 ¶¶ 183-184.

Independent evidence supports Plaintiff's claim of outstanding performance.  Bodman rewarded him with significant compensation increases: hired at $35,000 and moved to $230,000 by 2008.  On January 14, 2014, Bodman provided Cargian with a reference letter praising him for "his dedication to the job"…"his integrity…attention to detail… knowledge of the watch industry… and entirely reliable."  Cargian Aff ¶ Ex. B.  At the time, Bodman was an employee of Breitling SA, the parent company. See:  Cargian Aff. ¶¶ 10-14.

Lisa Roman ("Roman") the former Marketing Director hired in 2002, testified that Cargian was "respected by Bodman"; was "one of the top sales reps from 2002-2010"; had an outstanding reputation", was "easy to work with, responsible, responsive to his accounts", and was good at getting accounts to marketing events. Pl. 56.1 ¶ Ex. 1 [2], Roman Tr. 77:9-79:4; 97:23-98:1; 85:14-87:6. [3]  Melissa Vessely ("Vessely"), the new Training Manager, who was hired by Prissert in 2012, described plaintiff as "very knowledgeable and well respected by the team"; he was cooperative, "liked by clients", "helpful" and "generally" did a good job.  Ex. 8,

---

[2] Unless otherwise noted, all Exs. Are attached to the Goodman Affirmation.
[3] Defendant may try to dismiss Roman's testimony on the ground that he fired her in 2014. This is a credibility issue which is the province of the jury.  On Respondent's summary judgment motion the inference regarding the testimony must be drawn for Plaintiff.

Vessely Tr. 110:14-17; 95:24-96:23; 100:20-24.  Cargian was also recognized by the trade

association as "Favorite Watch Rep" and given the Sully Award by Sales Manager Charles

Anderson ("Chuck Anderson" or "Anderson") and Bodman for highest increase in sales in 2010.

Cargian Aff.  Ex. C.

## B.  THE PRISSERT ERA: ESTABLISHMENT OF UNREALISTIC GOALS

Prissert replaced Bodman as President in 2011. Within one short year, under Prissert's

supervision, Cargian went from best to worst.  Prissert established barriers to assure Plaintiff's

failure. [4]

Prissert's first act was to set unobtainable goals for plaintiff, which were substantially

greater than any other rep. [5]  In 2011, Plaintiff's goals were raised by close to $12M or 92%,

while no other rep was raised by more than $7M or greater than 74%. Ex. 4, Def. Admissions ¶¶

33-54. These facts are uncontested, but Prissert deflects the issue by claiming, in an

uncorroborated allegation, that Bodman set Cargian's 2011 goal. Prissert Aff.  ¶ 22.   The

uncorroborated testimony of an interested witness is not usually considered on summary

judgment. *Reeves v Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).  That

admonition is particularly applicable here where defendant refused to produce Bodman for a

deposition requested by plaintiff. Goodman Aff. ¶ 2, Ex. 1.  The statement is also directly

contradicted by plaintiff. Ex. 9, Cargian Tr. 208:7-8; 225: 15- 226: 14; 222: 25- 223:16.

Defendant makes the further unsubstantiated claim that the significant increase is the

result of additional territory being assigned to plaintiff. No evidence is offered to establish the

---

[4] At the time there were 7 sales reps:  Cargian; Brian Criddle ("Criddle"); Patrick Cawthorne ("Cawthorne"); Beth Haddad ("Haddad"); Josh Haley ("Haley"); Rick Lambert ("Lambert"); and Annie Sommer ("Sommer"). (Collectively, "the comparators"). All were younger, most by over 5 years. Def. 56.1 ¶ 160.
[5] The most important role that sales goals play is in setting compensation.  The sales reps bonus is substantially dependent on the extent to which he meets his goal.

correlation between the additional territory and the amount of the increase.  Further, plaintiff's

assignment was increased by a net of 5 new doors (stores).  Cargian Aff. ¶ 7.  Haley, who also

received new territory, had an increase of at least 6 doors, yet his goal was only raised $7M or

63%.  Ex. 4. Def. Admiss. ¶ 29 46-48[6].

     Plaintiff, unsurprisingly, did not meet these unobtainable goals, and thus was adversely

impacted in his bonus.  He still increased his sales over the prior year. Cargian Aff. Ex. A.  But

defendant used failure to meet the unobtainable goals as a reason to place additional pressure on

plaintiff through papering his files for failure to meet his goals.

     Defendant's claim that 2012 was a good year warranting special bonuses to the sales rep

is contradicted by the records.  In 2012 total unit sales were down 14.97% from 2011; fewer

Bentley[7] doors were open and while 29 new doors were open, 42 accounts were closed and there

were 13 fewer Bentley customers.  Ex. 10, Breitling 9062.[8]  In terms of the total sales, they were

up only $2.5M over the prior year, whereas in 2011 there was a sales increase of $21M over

2010. Ex. 15, Pl. 0000280; Plaintiff, like the rest of the staff, did not do well; his sales were

down by $1M, but no rep increased his sales by more than $1M. Id.  House sales were up only

about $500,000 or by 1.64% increase. Id.  Internal and external factors, all of which are known to

defendant, affected plaintiff's sales.  As conceded by Anderson, in one of his many missives to

plaintiff, all of the high end watch makers were in trouble in the New York area.  "The territory

changed dramatically over the last few years… Rolex confirmed that it was down." Everyone is

---

[6] Defendant has continually tried to hide the ball on this comparative information.  Plaintiff, in his request for
admissions, put forward what he thought were the accurate numbers as to how many doors each rep had in 2010 and
then in 2011.  Defendant denied the numbers as to Cargian and Haley, yet refused to qualify the response as required
by the Rules. Ex. 4, at ¶¶ 1, 2, 4-5, 9.  Under summary judgment standards the inference to be drawn must favor
plaintiff.
[7] Breitling produced a "Bentley" line, in cooperation with the auto company.  Special exclusive contracts were
entered for stores to carry the line.  This was very valuable business. Cargian Aff. ¶ 37.
[8] Although, as discussed, Goodman Aff. ¶ 4, the accuracy of Anderson's PowerPoint charts cannot be confirmed, to
the extent Defendant relies upon them they are admissions against interest fully chargeable to Defendant.

struggling. Defendant's Ex. U.  Yet special bonuses were given, Plaintiff receiving the lowest.

Cawthorne who increased his sales by a mere $55,000 (0.55%) received a special bonus of

$8,500 while Plaintiff received $4,800.  Ex. 35 (Breitling 011, 8939).

## C.     REPLACEMENT BY AN UNQUALIFIED YOUNG MAN

In December, 2012, Prissert informed plaintiff that he was removing a substantial part of

his territory, reducing his responsibilities and, therefore, reducing his salary by $35,000 to

$195,000.  Cargian Aff. ¶ 22.  Anderson told Prissert he thought it was unfair to take away

territory.  Prissert in uncorroborated testimony says performance was the reason.  Independent

testimony contradicts Prissert's self-serving claim.

Prissert told Sommer, whose territory was also reduced, that the change was "so she and

Fred could concentrate on corporate sales and I [Sommer] could spend more time with my

family."  Nothing was mentioned about performance. Goodman Ex. 12, Sommer Tr. 20:2-13.

Prissert told Cargian the reason for the demotion was that he wanted to lighten plaintiff's load,

although plaintiff never complained about his load.[9]  Prissert's uncorroborated statement that he

was trying to help plaintiff is belied by the fact that he simultaneously raised plaintiff's goals by

14% while the other reps, except for Sommer, were raised between 8 and 10%. Ex. 9, Cargian

Tr. 149:5-12; Ex. 12, Sommer Tr. 59:9-14; 85:7-87:15.  The logic boggles the mind.  In 2011,

Prissert assigns the highest increase in goals to Cargian because he is assigned additional

territory.  In 2013, Prissert assigns the highest percentage raise to Cargian because he reduced his

territory.  The inference must be for plaintiff that Prissert's stated reason for the adverse actions

is not his real reason.

---

[9]  A year earlier plaintiff had asked to be relieved a Southern VA.  Reps have to visit their customers once a month
and simply traveling from his other district for the small territory took a full day which was wasted. Plaintiff,
therefore, asked to be relieved a Southern VA.  Cargian Aff. ¶ 3.

Prissert boldly asserts that "Because I <u>had</u> reduced Plaintiff's and Ms. Sommer's sales territory, I determined that Breitling needed to add an additional sales representative to cover the accounts in the territory that I <u>had</u> removed from Plaintiff's and Ms. Sommer's responsibility." Prissert Decl. ¶ 38 (emphasis added).  Isaac Schafrath's ("Schafrath") testimony contradicts, pointing to mid-summer when the promotion process began, 6 months before plaintiff's territory was reduced.

Schafrath had unsuccessfully sought a promotion at Breitling for 7 years.  Ex. 14, Schafrath Tr. 87:4-18.   However, he gained a relationship with Prissert, and it was Prissert who first proposed promoting Schafrath to sales rep Ex. 13, Anderson Tr. 323:5-13.   The first step was in the summer of 2012 when, for no reason associated with his then position, Schafrath was sent on a sales trip with Anderson to gain exposure.  Ex. 14, Schafrath Tr. 61:3-62:16.  A series of conversations[10] with Prissert, Anderson, and Amstutz followed in mid-October and he was told that they "hope they could find a place for him." Id. Schafrath Tr. 108:12-19.  More conversations occurred in November at which Schafrath was told that they wanted to promote someone from within the organization to sales rep and that he was the only inside person being considered.  Id. Schafrath Tr. 112:8-114:6.  At the end of November he was officially offered a contract, which did not specify his territory.   Schafrath further claims that he kept asking what his territory would be, indicating he would move anywhere, but was consistently told no decision had yet been made. Id. Schafrath Tr. 125:1-20; 126:21-127:16; 128:9-13; 148:24-149:2. Schafrath who had no reason to lie, gave compelling testimony that his promotion was in the works starting the summer of 2012 and that Prissert's claim about timing is not believable.

---

[10] The progression of the discussion regarding Schafrath's promotion can be found at Ex. 4, Tr. 105, 131.

Prissert knew that Schafrath had absolutely no objective qualifications for promotion to sales rep. He was the Vault (Logistics) Manager generally responsible for the safe keeping of the watches. Ex. 32. Prior to Breitling he was, for short periods of time, a bartender and kitchen assistant, a carpenter's assistant and video production assistant for the Ohio State University football team. Ex. 31.

What he did have is a sports background and a relationship with Prissert.[11] Prissert was a big sports fan, he talked "about golf a lot and football" and soccer and bet on games and Schafrath was involved in some of these conversations. Ex. 14, Schafrath Tr. 74:20-75:11 Although Schafrath never brought it up, on at least 5 occasions that Schafrath can recall, Prissert engaged him in conversation about his famous father, who was an all-star for the Cleveland Browns. Id. Schafrath Tr. 76:18-78:16.

Schafrath was concerned that his lack of experience was a problem, and although Prissert never asked, he raised the issue at the interview. Prissert responded that he "knows [me] well enough now and he has faith that I could do 'it well'". Id Schafrath Tr. 118:25-119:5. When asked how Prissert knew him, he responded, from around the office including from their sports discussions and discussions regarding Schafrath's father. Id Schafrath Tr. 118:10-120:2. Anderson, with whom Prissert claims to regularly consult, acknowledged that the promotion was not a good idea. As he said at the time it will "take some time to get the **kid** up to speed but we'll give him a chance". Ex. 13, Anderson Tr. 325:16-327:3 (emphasis added).

On about December 17, 2013, Prissert informed plaintiff that he was being terminated effective December 31, 2013, but that he should cease working immediately. The reason stated

---

[11]  Schafrath went to Butler University on a lacrosse scholarship and is the son of Dick Schafrath, an all-star football player at OSU and later for the Cleveland Browns. Schafrath never graduated from college.

7

was that "we just are not on the same page". Cargain Aff., ¶ 25.  Defendant now claims the

termination was performance related.  However, sales records for 2013 do not bear that out.

Sales were down companywide by about $9M or 8.9%. Ex. 16 (Breitling 633).  Three of the 7

reps had worse sales results than plaintiff, the worst being Rep "X," who was down 20.6%. Rep

"X" made only 70% of his sales goals while Cargian reached 79% of his goals, plus Cargian

opened 2 new stores, Rep "X" opened none and Cargian was more active, making more

customer visits than Rep "X". Ex. 5, Breitling 636; Ex. 36, Breitling 8984, and 8952.  Moreover,

rep "X" [12] committed a serious ethical breach by submitting false business records and was not

penalized. Discussed *infra*.  Finally, although plaintiff, because of his demotion, had a territory

about half of Rep "X", the latter sold only about $2.5M more in gross sales. Ex. 16, Breitling

633.

        Also, Haley's [13] production was down 17.27% and Haddad was down 14.68%, while

plaintiff was down 13.84%, Plaintiff was clearly not the worst producer.  Only Lambert had

positive results, but he increased his sales only by about $500,000.  It is also interesting to note

that the House sales at the boutiques and Tourneau only increased by $800,000. Ex. 16, Breitling

633.

        The devious and subtle means to promote a young inexperienced Schafrath was to give

him a year of training with a small territory and then fire the significantly older gay man, and

promote Schafrath to a full territory. Attempting to avoid the obvious—Schafrath was Cargian's

replacement at termination--Anderson gave uncompelling testimony claiming that although he

---

[12] Although defendant apparently had no compunction about publicly revealing the name of the wrong doer (Prissert's Aff. ¶ 54), which plaintiff believes may have violated Connecticut law and was not necessary at this stage,  to the extent possible and where appropriate, as plaintiff has done in past briefs, he will continue to refer to him as rep "X"
[13] The chart relied on refers to the rep by first name.  Haley is "Josh" and Haddad is "Beth".

saw a need for an 8th rep in 2013 when they promoted Schafrath, he saw no such need at the end

of 2013 when they terminated plaintiff, so they did not look to hire an 8th rep for 2014.  When

pressed as to why he suddenly saw no need for an 8th rep when one was needed a few short

months earlier, the best response Anderson's could come up with is "I just felt that way".  Ex.

13, Anderson Tr. 84:4-85:24.

     Unqualified Schafrath failed horribly.  It was not just that his sales were down, but that

his work ethic was a primary problem.  Nonetheless, he was given a newly created position of

sales analyst assisting Prissert and Anderson, which was a promotion from the Vault Manager

Job. Ex. 14, Schafrath Tr. 293:5-19; 296:2-297:1.

## D.  BOYS CLUB ATMOSPHERE/PLAINTIFF TREATED LIKE ONE OF THE GIRLS

     Breitling's marketing campaign creates a macho image.   Although Breitling sell

primarily to men, the marketing material created would not appeal to gay men. Ex. 8, Vessely Tr.

141:25-144:7.  Contrary to Prissert's assertion that the marketing image is merely a generic pin

up from an aviation culture, it is significantly more licentious. The material features pictures of

women straddling a phallic symbol; and women with exposed breasts. Ex. 17. The president of

the parent company, Breitling SA, where the U.S. staff goes once a year, has on the wall of his

business office a picture of a naked woman, legs spread exposed pubic hair being leered at by a

hovering man. Ex. 18. Female workers are forewarned about entering. Ex. 19, Morice Tr.

103:25-104:18.  There is also a large statue in the 57th Street boutique of a woman's pantied

crotch exposed while straddling a bomb. Cargian Aff. Ex. C.

     Under Prissert, the macho/boys club atmosphere became not just a marketing device, but

part of the workplace practices.  Female employees, including the two female sales reps,

complained that the boy's club atmosphere excluded women from the president's inner circle.

The women confirmed that plaintiff was excluded from the inner circle, just like the "girls".  Pl. 56.1 Statement ¶¶ 168-175.  Haddad submitted a written complaint to her manager, Anderson, that Prissert discriminated against her because of her gender. Pl. 56.1 Statement ¶¶ 165-167; Ex. 20.  Anderson's sworn declaration claims that he did not believe Haddad's complaint was about gender.  Anderson Decl. ¶ 14. This is contradicted by his sworn deposition testimony: "**Q**. Did you understand that Ms. Haddad was complaining that she was being treated unfairly because she was a woman. **A**. Yes." Ex. 13, Anderson Tr. 54:10-15. It would be hard to see how he could not see it as a gender discrimination claim, since Haddad said that she was tired of his "boy v. girl" tactics.  Ex 20.  No action was taken on this complaint, nor would it have mattered. When Roman submitted an objection to what she viewed as discriminatory treatment, she was reprimanded by Prissert and told "she had no say as to how, when or why warnings are delivered". Ex. 7, Roman Tr. 55:2-14; Ex. 37.

Exclusion from the President's inner circle led to women and plaintiff being excluded from important events which would enhance their careers.   In 2013 a major marketing event was held at the Bentley factory in Crewe, England.[14]  Prissert made the decision as to which reps are to be invited.  Ex. 13, Anderson Tr. 290:13-23.  All of the male sales reps, except plaintiff, were invited and none of the women were invited. Defendant claims that only the reps with customers with substantial Bentley prospects were invited.  In contradiction, Cargian's clients were invited and he had more Bentley doors than any other rep.; Ex. 22 (Breitling 9041); Cargian Aff. ¶ 37a, yet he was not invited.

There is an annual air show in Bouchs, Switzerland which Breitling used for marketing. Starting 2011 Prissert brought two male sales reps to attend with him.  Cargian Aff. ¶ 37b.

---

[14] See Plaintiff's Affidavit ¶ 37 for description of the importance of the Bentley relationships and sales.

The final insult was that in 2013 at a business conference in Basel, Switzerland, plaintiff was assigned to share a room with a female rep Annie Sommer ("Sommer"). Ex. 12, Sommer Tr.16:24-17:3. Neither requested the sharing arrangement. Ex.12, Sommer Tr.17:4-6. Cargian Aff. ¶ 37c. Prissert claims he did not make the decision, however, Sommer said it was Prissert who told her. Id. Ex. 12, Sommer Tr.17:21-23.   See: Plaintiff's Opp. to Def. Rule 56.1 ¶ 141.[15] The assignment of the room sharing is part of the cumulative evidence of discrimination—treating plaintiff like one of the "girls".

## E.  UNFAIR DISCIPLINARY TREATMENT

Plaintiff was subjected to harsher disciplinary processes than his colleagues.  Prissert alleges he had to reprimand plaintiff because he "violated company policy" by giving cash gifts to his assistants at Christmas.  Prissert Aff.  ¶ 45.  There is no such policy. Ex. 28, Figueroa Tr. 52:24-53:8. Cargian Aff. ¶¶ 29-30.

Prissert cites a second alleged incident where he claims that on September 16, 2012 at a business event in Reno plaintiff yelled at him and used the "f" word to him.  Without any investigation or even meeting with plaintiff, on September 18, 2012, Prissert sent plaintiff a harsh written warning letter signed by the President not the HR Manager. Prissert Decl. ¶¶ 46-47, Ex. 21. Cargian disputes the facts, and Prissert's rendition of what happened is disputed.[16] Plaintiff's Opp. 56.1 Statement ¶¶ 92-93,  See Ex. 12, Sommer Tr. 87:6-89:13;  Ex. 26, Amstutz Tr. 213:13-214:5.  Prissert could recall no witness in the vicinity to corroborate his statement. Ex. 27, Prissert Tr. 325:13-20. There is also evidence that Prissert embellished his story.

---

[15] Defendant claims that Cargian and Sommer wanted to share as old friends. This is highly contested, which cannot be decided in summary judgment.
[16]  A full statement of what plaintiff claims happened at that event and how he was mistreated is found at Cargian Aff. ¶¶ 31-32.

Compare the warning letter claiming the incident happened in front of clients and staff and his initial statement saying it happened "**almost** in front of clients and staff" admitting that it was not in front of guests of the staff as his warning states.  Ex. 21, Breitling 1444 (emphasis added). What it most significant is that no inquiry was made of Cargian, or any other person who might arguably have been in the area.  The warning letter was issued without investigation or due process.

The contrast between the peremptory action taken against plaintiff, and the methodical investigation of the charges and the lesser discipline taken against Rep X who committed a far more serious ethical breach is stark.  For many months "X" deliberately lied on his call reports stating that he was visiting customers when in fact he was not even in that territory, but rather on personal excursions. See generally Pl. 56.1 Statement ¶ 210.  For example, he would claim expenses for travel to Las Vegas to make customer calls, when in fact he was in California.  He claimed these personal excursions as business expenses.  Ex. 26, Amstutz Tr. 118:2-11; 127:24-128:21; 130:19-131:13; Ex. 13, Anderson Tr. 102:7-103:4; Ex. 27, Prissert Tr. 61:19-62:15. Anderson had the records and questioned "X", but he continued to lie to his boss. Ex. 13, Anderson Tr. 110:13-111:10. Nonetheless, before making any final decisions regarding the misbehavior, there was a full investigation including interviewing "X".   Ex. 26, Amstutz Tr. 218:12-219:11.  Amstutz recommended firing, but Prissert said he first wanted to interview him before making his decision. Ex. 26, Amstutz Tr. 130:6-131:7, 132:2-3.  No disciplinary action was taken against X except that he had to repay the money he improperly claimed were business expenses.  Ex. 13, Amstutz Tr. 134:20-135:9.  He was given a "warning" however, it was signed by the HR Manager Diane Figueroa, who was not involved in the investigation and has no responsibility for the sales force except for administrative processing of payroll etc. Its tone is

significantly less harsh and does not even make a reference to his behavior, when for many months he lied to his boss. Ex., Figueroa Tr. 79:12-22; Ex. 26, Amstutz Tr. 135:10-14. Compare Ex. 21 to Ex. 25.

Under the standards for the quantitative bonus, "X" did not do well. Nonetheless he received a bonus for quality of work of $6,300, $3,000 of which was unfathomably attributed to "reporting".[17] Ex. 36 (Breitling 8952).

## ARGUMENT

### APPLICABLE LEGAL STANDARDS

Defendant does not even pay lip service to the legal standards that this Court must apply on a summary judgment motion. Rather, Breitling invites the Court to try this case on the papers by improperly making all credibility determinations and drawing all inferences in its favor. The Supreme Court in *Reeves v Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000) definitively restated the standards for summary judgment in discrimination cases.

> [T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations weigh the evidence. Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses. *Id.* at 151(emphasis added) (citations omitted).

---

[17] Plaintiff believes that great injustices would have been uncovered had he been allowed to reconvene the deposition of Amstutz. As the Court might recall the bonus sheets such as the one attached herewith as Goodman Ex. 29, were not produced in discovery until after the deposition of Amstutz. Plaintiff moved to reopen the Amstutz deposition precisely for the purpose of making inquiries regarding the basis of these bonus calculations. Plaintiff's request was denied by the Magistrate, and his was ruling upheld by the Court. Ex. 30.

The burden of proof is always on the movant.  *Brady v. Town Colchester*, 863 F.2d 205, 210 (2d Cir. 1988).

The Second Circuit has repeatedly "expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent" *Holcomb v Iona College*, 521 F. 3d 130, 137 (2d Cir. 2008) (citations omitted).  "An employer who discriminates is unlikely to leave a 'smoking gun', attesting to a discriminatory intent".  *Rosen v. Thornburgh*, 928 F. 2d 528, 533 (2d Cir. 1991); *Ramseur v. Chase Manhattan Bank.* 865 F.2d 460, 465 (2d Cir. 1989) ("clever men may easily conceal their motivations" (citation omitted).   Judge Smith of the NY Court of Appeals was even more direct when he wrote "[D]iscrimination is rarely so obvious or its practices so overt that recognition of it is instant and conclusive, it being accomplished usually by **devious and subtle means".**  *Ferrante v American Lung Ass'n*, 90 NY 2d 623, 687 N.E. 2d 1308, 1313 (N.Y. 1997) (citations omitted, emphasis added).  The instant case falls within this area of caution. There is no "smoking gun".  Nor is Plaintiff relying on discriminatory statements, stray or otherwise.  Rather it is the cumulative weight of the totality of the evident that must be considered. *Luciano v. Olsten Corp.*, 110 F. 3d 210, 215 (2d Cir. 1997).[18]

The Court should reject defendant's invitation to individually analyze each discrete act in determining discriminatory intent.  Second Circuit law teaches that because there is rarely "direct evidence" plaintiff usually must rely on 'bits and pieces' of information to support inferences of discrimination, *i.e.*, a 'mosaic' of intentional discrimination." *Vega v. Hempstead Union Free School District,* 801 F. 3d 72, 86 (2d Cir. 2015) (citation omitted). "In determining the

---

[18]   Defendant makes the outlandish argument that intent or motivation to discriminate cannot be proven absent evidence of discriminatory remarks.  Defendant's Memo p 14.  Even the case law relied upon by defendant cautions that the court must look at the totality of the evidence to determine intent.

appropriateness of summary judgment, the court should not consider the record solely in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence for a jury, in assessing… pretext… for discrimination, would be entitled to view the evidence as a whole." *Howley v. Town of Stratford,* 217 F. 3d 141, 151 (2d Cir. 2000) (citation omitted). "[I]f there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Howley, supra* at 217 F. 3d 151.

Nor is the case law cited by defendant where summary judgment is granted particularly instructive.  As Judge Nancy Gertner pointed out, because granting summary judgment ends a claim, the rules require a written decision by the Court.  "But when the plaintiff wins 'overburdened judges' typically write[] a single word of endorsement—'denied'—and the case moves on to trial"  Gertner, Nancy, "Losers Rule", The Yale Law Journal Online 122:109, 2012, p. 113; http://www.yalelawjournal.org/forum/losers-rules.  Thus the reported cases are asymmetrical, favoring the moving party.  Each case being *sui generous* must be viewed in the context of the totality of its specific circumstances—its own "mosaic."

Plaintiff was treated more harshly than his younger male straight colleagues; he was replaced by an inexperienced straight man 20 years his junior; as a gay man he was treated like and lumped in with the "girls" whom defendant discriminated against; and that defendant's proffered reason for its adverse actions are not the real reason. The totality of the circumstances leads to the conclusion that sexual role stereotyping, sexual orientation and age were motivating factors in defendant's decision to demote and fire plaintiff.

**POINT I: SUMMARY JUDGMENT STANDARDS**

Plaintiff claims that he was discriminated against, (1) because of his age in violation of the ADEA and the NYS Human Rights Law; (2) because of gender stereotyping under Title VII of the Civil Rights Act; (3) because of his sexual orientation under the NYC and NYS Human Rights law; and (4) because his age under the NYC Human Rights Law. Different summary judgment standards of proof apply.

The *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973) proof standard applies to all statues.[19]  Plaintiff's burden in establishing a prima facie case is minimal. *Bucalo v. Shelter Island Union Free School Dist.*, 691 F. 3d 119, 128 (2d Cir. 2012).  Summary judgment standards, however, differ. The federal and state statutes are analyzed under the same summary judgment standards, *Brennan v Metro. Opera Ass'n. Inc.*, 174 F. 3d 310, 316 (2d Cir. 1999), while the city law requires an independent analysis.  With the passage of the Local Civil Rights Restoration Act of 2005, Local Law No. 85[2005] ("LCRRA"), the City Law is significantly more protective of individuals claiming discrimination and claims are to be analyzed separately. Under the City Law summary judgment should be granted only if "no jury could find defendant liable under any of the evidentiary routes." *Melman v Montefiore Medical Center*, 946 NYS 2d 27, 30 (1st Dept. 2012).  The Second Circuit in *Mahalik v Credit Agricole Cheuvreux No. America*, 715 F. 3d 102 (2d Cir. 2013) recognized that an independent analysis was required under the City law. The NYCHRL does not "require a connection between the discriminatory conduct and a materially adverse employment action." *Richard v. N.Y.C. Dept. of Ed.*, 2015 WL 4164746, *10 (S.D.N.Y. July 10, 2015).

---

[19] To establish a *prima facia* case, a plaintiff must show (1) membership in a protected class; (2) qualifications for the job at issue; (3) plaintiff was subjected to adverse employment action; and (4) adverse action was taken under circumstances giving rise to an inference of discrimination.

The LCRRA is equally applicable to age discrimination claims brought under the City law. "Plaintiff may defeat summary judgment in his NYCHRL claim by demonstrating that age-based discrimination was a 'motivating factor' even if not the 'but for cause' of the decision to terminate him." *Twomey v QuadGraphics, Inc.*, 2015 WL 5698002 *8 (S.D.N.Y. 2015). Even under the ADEA, the 'but for' cause of the adverse employment action is not equivalent to a requirement that age was the employers only consideration, but rather that the adverse employment action [  ] would not have occurred without it." *Delany v Bank of America Corp*, 766 F. 3d 163, 169 (2d Cir. 2014)(citations omitted).

## POINT II: DEFENDANT HAS NOT CARRIED ITS BURDEN OF PROOF ON SUMMARY JUDGMENT

### A.  AGE CLAIM UNDER ADEA AND NYSHRL and NYCHRL

Defendant does not seriously dispute that Plaintiff meets the first three prongs of *McDonnell Douglas,* but challenges that Plaintiff's claim raises an inference of age discrimination. Plaintiff has met the minimal standards for age discrimination under all three statutes.[20]

Replacement by a significantly younger person has been found to satisfy the *prima facia* case, where, as here, defendant was aware of the significant age gap. *Bucalo v. Shelter Island Union Free School Dist.*, 691 F. 3d 119, 130 (2d Cir. 2012).  "A permissible inference of discriminatory intent may also be raised by the fact that the employer searched for applicants no

---

[20] Plaintiff claims that there was a continuum of adverse actions starting in January 2011 when he was assigned unobtainable goals all of which led, plaintiff believes purposefully, to his ultimate termination. Along the way there was loss of income as a result of the adverse action, which claims remain viable under the city and state law, through precluded federal statutes of limitations.

more qualified than plaintiff.  See: *Chambers v. TRM Copy Ctrs. Corp.,* 43 F. 2d 29, 32 at 13 (3d Cir. 1994).  Schafrath was close to 20 years younger than plaintiff when he replaced him.

Defendant sought and replaced Plaintiff's with a man 20 years his junior who had no qualifications for the position, discussed supra. There is ample evidence that it was not Plaintiff's performance but rather that Prissert affirmatively wanted to promote this young man, whose sports interest coincided with his own. As discussed fully at p.6-7 supra, defendant was grooming Schafrath to take plaintiff's place. Anderson, Prissert's sales manager with whom he claims to routinely consult, warned Prissert that it would "take some time to get the kid up to speed. Ex. 13, Anderson Tr. 325:16-327:3 (emphasis added).

Defendant's claim that Plaintiff's failure to meet sales goals was a basis for demotion and termination has also been significantly contradicted.  There is uncontroverted evidence that Plaintiff was given higher unobtainable sales goals, and greater percentage increases in sales goals than his comparators in both 2011 and 2013, [21] those being the setup for allegations of failure.  Ex. 4, Def. Resp. to Admiss. ¶¶.  Prissert's claim that Bodman set the goals in 2011 is discredited by defendant's refusal to present Bodman, an employee of the parent corporation, for a deposition.  Goodman Aff. ¶ 2.  It is also contradicted by plaintiff's testimony. Ex. 9, Cargian Tr. 208:7-8; 225:15-226:14; 222:25-223-16.

Equally contested is defendant's alleging the validity for the significant raise in plaintiff's goals: additional territory added to his responsibility. Nowhere does defendant introduce any underlying documents of how that worked in a dollar to dollar form. Moreover, plaintiff put in evidence that another rep, Haley, also had an increase in territory transferred to him from

---

[21] All of the sales reps are younger than Plaintiff by at least 5 years. Def. 56.1 ¶ 160.

Anderson, yet his goal was only increased by 63% as contrasted to plaintiff's 92% increase. Plaintiff's Opp. to Def's Rule 56.1, ¶ 190-191 Ex. 4, Defendant's Resp. to Admission.

Another highly suspect rationale offered by defendant for the demotion is that Prissert wanted to give plaintiff a chance to succeed in meeting his goals. Prissert ¶ 35. Then how does he explain why he raised Plaintiff's 2013 goals by 14% while the younger male reps were raised between 8%-10%. Ex. 9, Cargian Aff. Ex. 12; Ex. 12, Sommer Tr. 85:7- 87:15. ¶¶ 3,35,45-47.

Serious question is raised about defendant's motivation and intent when it replaced plaintiff with a young man with absolutely no discernible qualifications for the job who predictably failed in the job, and where the sales manager warned that it will "take some time to get the **kid** up to speed".  Anderson Tr. 325:16-327:3 (emphasis added).  Nor does the fact that the decision maker is of the same protected age group preclude finding discrimination. *Bryan v. Chemical Bank,* 617 F. Supp. 1070, 1071 (S.D.N.Y. 1985).

A jury can find pretext based solely on its belief that the defendant is not telling the truth. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502 (1993); *Reeves,* supra.

## B.  GENDER DISCRIMINATION

### 1.  TITLE VII

Defendant concedes, as it must, that discrimination based on gender stereotyping raises a cognizable claim of discrimination under Title VII. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998), *Price Waterhouse v Hopkins*, 490 U.S. 228, 251-52 (1989), *Simonton v Runyon*, 232 F 3d. 33, 37 (2d Cir. 2000).  Defendant mistakenly argues that because plaintiff asserts the same facts in support of his gender stereotyping claim under Title VII and his gender orientation claim under the local laws that he is bootstrapping his claim onto Title VII. Def.

Memo pp 5-9. Clearly Defendant does not understand the law; sex stereotyping is but one form

of sexual orientation discrimination, just as sex stereotyping is but one form of gender

discrimination. *Price Waterhouse v. Hopkins*, supra.

Further, this Court should not ignore the fact that the law regarding Title VII's coverage

of sexual orientation discrimination is rapidly changing. The EEOC ruled that the Title VII ban

on gender discrimination by definition includes discrimination on the basis of sexual orientation.

*Baldwin v Fox*, 2015 WL4397641* 4-10, (July 16, 2015). In a cogent opinion, the EEOC tribunal

demonstrated how courts have routinely applied Title VII to cases not specifically named in the

law. For example, Title VII has been applied to such situations as interracial relationships,

sexual harassment, gender stereotypes, and atheism as discrimination based on race, gender, and

religion. As the EEOC points out, no protected group of "people in interracial relationships" or

"masculine women" or "non-believers" had to be established to find that there was

discrimination based on race, gender or religion respectively. Id at 27. This principle was

echoed by Justice Scalia in *Oncale* when he said: [S]taturoty prohibitions often go beyond the

principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our

laws rather than the principle concerns of our legislators by which we are governed." *Oncale*,

supra at 523 U.S. 79. The EEOC thus concluded that in applying the statute as Congress has

charged, the "allegations of discrimination on the basis of sexual orientation necessarily state a

claim of discrimination on the basis of sex." "An employee could show that the sexual

orientation discrimination he or she experienced was based on [his] sex ...because it was

premised on the fundamental sex stereotype norm."

The EEOC's decision is entitled to deference under *Chevron, U.S.A. Inc. v. Natural*

*Resources Defense Council Inc.*, 467 U.S. 837 (1984) as the Agency charged with enforcing

Title VII, or in so far as it is able to persuade under *Skidmore v Swift & Co.*, 323 U.S. 134, 140

(1944). *Baldwin* is persuasive and at least one court has already found it so. *Isaacs v. Felder*

*Servs. LLC*, 2015 WL 6560655* 3 (M.D., Ala. Oct 29, 2015). [22]  It is also persuasive on its face

and in light of the Supreme Court's interceding rulings extending constitutional protections to

homosexuals. *Obergefell v Hodges*, 135 S. Ct. 2584, 2604-05 (2015); *U. S. v Windsor*, 133 S.

Ct. 2675 (2013). The Second Circuit has opened the door to add this expansion. In *Fowlkes v.*

*Ironworkers Local 40*, 790 F. 3d 378, at 386 (2d Cir. 2015) the Court extended equity to a

transgender litigant to pursue a Title VII case based on the EEOC's *Macy v Holder*, 2012

EEOPUBLEXIS 1181 (E.E.O.C.Apr.20, 2012.)

      As either sex stereotyping under Title VII gender discrimination, or sex stereotyping

under City Law, plaintiff as a gay man was treated less well than straight men because, based on

the fact that as a gay man he was stereotypically viewed as one of the "girls" by Prissert; and the

workplace was permeated with a macho atmosphere that excluded "the girls' from the

president's inner circle.

      Defendant argues that although plaintiff satisfied the first three prongs of *McDonnell*

*Douglas,* he has not met even the de minimus standard of the fourth element, namely an

inference of animus.  On this summary judgment motion Defendant cannot overcome Plaintiff's

evidence that he was excluded, along with the "girls", from the president's inner circle.  There is

ample independent evidence from other employees that Prissert maintained a boys club

atmosphere excluding women and plaintiff from his inner circle.  Pl. 56.1 Statement ¶¶ 165-175.

As Schafrath testified, Prissert got to know him through many of these sports conversations,

---

[22]  Contra: *Christiansen v Omnicom Group*, Inc. 2016 WL 951581 (S.D.N.Y. March 9, 2016)

resulting in his promotion despite lack of any qualifications. Ex. 14, Schafrath Tr. 74:20-75:11; 77:19-78:16(fully discussed p.6-7 supra).

This is not an issue of imposing a civility code; nor is it trivial.  When the President of a company engages in behavior which excludes a protected group its impact is not *di minimus*. "A jury could find that the exclusionary culture fostered by [supervisors] evidence a biased attitude toward the excluded group." *Zakre v. Noddeutsche., Inc.* 942 F. Supp, 937, 946 (S.D.N.Y. 1996). See also: *Bryson v. Chicago State Univ.* 96 F. 3d 912, 917 (7th Cir. 1996). Such exclusion directly affects an employee's status in the work place.  Schafrath is a perfect example. He had direct easy contact with the President, which access gave him entrée for promotional consideration denied him earlier.

Plaintiff has offered a number of examples where he and the women have been excluded from important business related events that would enhance their position.  Pl. 56.1 Statement ¶. 177-180.

Further evidence of the stereotypical treatment of plaintiff as a girl is that Breitling assigned him to share a room at a business conference with a female colleague.  This was inappropriate and objected to by both plaintiff and Sommer. Plaintiff's Opp. To Defendant's 56.1 Statement ¶. 141.

Further the workplace atmosphere is rife with inappropriate degrading images of women. It is uncontradicted that Breitling uses as marketing tools graphic images of women with exposed breasts and crotches and in provocative poses.  Defendant dismisses these images as mere "pin ups" that go with its aviator motif.  A reasonable jury could agree with plaintiff that the décor borders on pornography which exhibits hostility toward women. Ex. 17, Cargian Aff. Ex. C.

They are surely not pin ups that would entice gay men. Ex. 8, Vessely Tr. 142:13-144:7.  Is it inconceivable to Defendant that pilots can be gay men or female?

## 2.  SEX ORIENTATION DISCRIMINATION UNDER THE STATE AND CITY LAWS

Its final argument is that plaintiff fails to state a prima facie case of sexual orientation discrimination under the local laws.  Again, defendant misses the point, the claim is that as a gay man he was sex stereotyped as a "girl" and discriminated against because he was treated like a "girl".  The arguments made under point 1 supra and the statement of facts are equally applicable.

Defendant's entire argument is grounded on its claim that that plaintiff failed to provide any "direct" evidence regarding sexual orientation and then makes the ludicrous argument that in the absence of any evidence of comments regarding his sexual orientation "Plaintiff cannot establish that Breitling actions were motivated by discrimination." Def. Memo p 14.   This argument is barely worth a response since the law is so clear; those who discriminate do so in devious and subtle means.  *Ferrante* supra, and do not announce their discriminatory intent by placing a note on the employees personnel file. *Rosen v. Thornburgh*, supra.

In addition to the sex stereotyping evidence, as described at length above, plaintiff has offered further evidence that defendant's claimed basis for its adverse action is not its real reason.

1.  Through the various memos such as, Ex. M and following, Defendant, alleges that that plaintiff was basically lazy and did not make required service calls and showed a disinterest in work. **Contested Fact:**  Defendant's records show that in 2012 he made a total number of 332 or average 7.72 per week, the second highest, while Haley made 292 or 6.34 per week, Lambert

133, Cawthorne 219. Ex. 33, Breitling 9063; Ex. 8, Vessely Tr. 110:14-17; 95:24-96:23; 100:20-24. Vessely who did not come on until 2012 testified that plaintiff is "very knowledgeable and well respected by the team". He was cooperative and "generally did a good job". Ex. 8, Vessely Tr. 110:14-17; 95:24-96:23; 100:20-24. And his comp time records show that he took very little of the time owed to him in 2012. Ex. 24.

2. Defendant claims as a legitimate basis for termination plaintiff's violation of policy of giving cash gifts, **Contested fact.** There is no such policy. Ex. 28, Figueroa Tr. 52:24-53:8.

3. Defendant claims that the in 2013 plaintiff was one of the worst performers. **Contested fact:** Not true, Rep "X" was the worst performer in 2013; Haley and Cargian had the same performance. No one, including the house, performed well in 2013. Ex. 15.

4. Defendant claims the 2011 goals were raised because of plaintiff's increased territory. **Contested Fact**: Haley's territory was also increased, but his goals were raised only 63%. Defendant refused to provide corroborative information regarding the increase of territory between Haley and Cargian. Ex. 4 Def. Admissions ¶ 1.

5. Defendant claims that Plaintiff was disrespectful to him in 2012. **Contested Fact:** The facts of the alleged incident are hotly disputed, but more importantly, Prissert took disciplinary action against plaintiff without ever investigating or talking to him. In contrast, months of investigation went into review of X who submitted fraudulent business records, and no action was taken against him until management interviewed him to decide what to do. Ex. 26, Amstutz Tr. 130:6-131:7, 132:2-3; 218:12-219:17.

6.  Defendant claims it helped plaintiff out by lowering his goals in 2012 and 2013, Def. Ex. P. **Contested fact:** mid-year reduction in goal were given to every sales rep presumably because no one reached goal by mid-year. Ex. 34.

7.  Defendant claims that plaintiff's sales were below par as the reason for demotion and termination.  **Contested fact:** If that were the real reason, why would a business person making legitimate business decisions hire a totally untutored replacement.

Breitling may have met its minimum standard of articulating a legitimate basis for termination, work performance. But, although an employer may have a valid reason for adverse action, but the standards and policies must be equally applied to all.  *McDonald v. Santa Fe Trail Trans. Co.,* 427 U.S. 273, 283 (1976). The "bits and pieces" of evidence gathered by plaintiff create just that "mosaic" that could lead a reasonable jury to conclude that work performance was not the real reason, and discriminatory animus was.

Dated:  New York, NY
      March 29, 2016

Respectfully submitted,

Janice Goodman
Law Offices of Janice Goodman
Attorney for Plaintiff
233 Broadway, Suite 2704
New York, NY 10279
(212) 869-1940