UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FREDERICK M. CARGIAN,

                Claimant,                              **15 CV 01084 (GBD)(HP)**

against                                                 **Affidavit: Frederick M. Cargian**

BREITLING, USA, INC.,

                Respondent.

FREDERICK M. CARGIAN, being duly sworn, deposes and says:

    1. I am the Plaintiff in this action and submit this affidavit in response to Defendant's Motion for Summary Judgement.

    2. I was born November 23, 1960 and was 53 years old when my employment as a Sales Rep at Breitling USA ("Breitling" or "Defendant") was terminated. I am gay, a fact well known to my colleagues at Breitling, including management.

**EMPLOYMENT 1990 THROUGH 2010**

    3. In February 1990, I was hired by Marie Bodman ("Bodman") President of Breitling as National Training Manager. This was the first training program for Breitling, and continues to be the platform upon which the training program, in effect when I left, was built. In this job I traveled throughout the United States conducting seminars and individual training of the sales

1

associates and managers in the stores to which we sold. The concept was to educate our sales personnel at the retail outlets on the watch functions that were complicated, the history of Breitling since its inception in 1884 and sales techniques so that we had the best qualified representatives for our product.

4. When I first joined Breitling it had a minimal presence or brand recognition in the United States, the office only having been opened in 1989. At the time, there were 6 or 7 staff employees. The sales rep that Breitling used at that time were independent contractors who represented any number of products. Our sales were between $2 and $4 million per year. By 2013 this grew to about 140 staff and sales of over $100 million a year.

5. In 1992, I was promoted to Sales Representative ("sales rep" or "rep") covering the Northeast Region which, at the time, ran from Maine to Richmond, Virginia. I continued to function as the Training Manager as well, which meant I was doing two jobs, training Breitling Associates across the country as well as selling in my own very large region. I was relieved of my responsibilities as Training Manager in about 1995 or 1996.

6. The major role of the sales rep was to sell in his/her region. There were ancillary duties associated, such as working with marketing personnel, training, maintaining inventory assuring that customer locations were well maintained, all of which were for the purpose of enhancing sales.

7. For the main part, success as a sales rep was measured by year over year sales, not attaining of goals. Every month each rep would receive a print out for the entire sales force showing how that month's sales compared with the same month the prior year. At the end of the year we would receive a year over year synopsis of our performance. Exh. A, Pl. 0000281-282. At our sales meetings, Anderson also focused on year over year performance. Sales goals, on

the other hand, related to compensation, which was totally controlled by management. The reps bonus was based on the extent to which s/he met the goal. Though sales reps may have been asked for our input, it was always a tug of war with management always prevailing. It was a money negotiation. The setting of difficult goals is the perfect mechanism to criticize a rep the company wants to get rid of.

8. I played a significant role in the growth of the Breitling. Attached as Exh A is a chart that I created from Breitling's official sales reports, which are also attached. From 2001 to 2009 sales reps only had access to our individual sales. Starting 2008 we received the reports for all reps which enabled me to do a comparative analysis of my production from that point until 2011 when Thierry Prissert ("Prissert") stopped supplying reps with the sales goals of the other reps. We did continue to receive reports reflecting the year over year results of all reps.

9. A review of Exhibit A shows that from 2002 through 2007 I increased my sales over the prior year from anywhere between 15% and 46%. Three of those years I was over my sales goal (which we called budget) by 118-130%. The two other years I attained 96% and 99% of budget. 2008 and 2009 was the recession and all sales went down; none made budget. By 2010 I again increased my sales by 40% and again had the highest gross sales of all reps. Over the years I was consistently able to make budget and, more important, consistently raised my sales over the prior year until Prissert became President and set unachievable goals for me.

10. In addition in the early 1990s, I opened the Tourneau account nationally. Tourneau is the largest luxury watch retailer in the world. The Corporate offices, located in New York, does the buying for its stores throughout the country. This was and is the single largest retail account for Breitling account. At one point there were as many as 37 individual doors (stores) to which we sold. The gross sales nationally went as high as $26.6M.in a year. I continued to

service that Corporate account until my termination, as well as the eight (8) individual Tourneau Stores in the Northeast Region, though I was denied bonus credit for the work. Discussed ¶ infra.

11. As a consequence of my good work, and the growth of the company, President Bodman rewarded me with regular and significant salary increases. To the best of my recollection, my starting salary in 1990 was about $35,000. Bodman increased my salary regularly with my final raise in 2008 from $210,000 to $230,000. This was my salary until 2013 when Prissert decreased it to $196,000 in 2013.

12. There is no question but that Bodman had high regard for me and my work. Of course, over the course of 20 years, as my boss there would be critiques of me and others. But the bottom line is that I was the sales rep that she rewarded with the highest base salary and I believe the highest bonus potential. I was also the sales rep to whom she assigned the Tourneau Corporate account ¶ *infra,* and whom she called upon to help in general in the New York area. For example, when Breitling decided to open a boutique in New York, I was the one who she enlisted to help find a location, despite the fact that I knew it would harm my sales. Finally, upon my termination Bodman provided a letter of reference lauding me for my "dedication to the job" "integrity" "attention to detail" and "knowledge". Exh. B. This is particularly impressive since at the time, as now, she is an employee of Breitling SA, the corporate parent.

13. I was also recognized by our trade association as "Favorite Watch Rep" and was given the Sully Award by Chuck Anderson ("Anderson") and Bodman for highest increase in sales in 2010. Exhs. C & D..

**EMPLOYMENT 2011 TO TERMINATION**

14. In 2011, Prissert became the President of Breitling. My first meaningful encounter with him as President was at the review meeting in January or February of 2011 when I received my sales goals for 2011. At that meeting, I was given a totally unrealistic sales goal. My goal was increased by $12 million representing a 92.2% increase in my goals over the prior year. My goal was higher in percentage and absolute number than any of the other reps.

15. Bodman, who remained on staff for a transition, and Anderson who became the full time Sales Manager under Prissert, were also at that meeting, but it was Prissert who had the ultimate responsibility for setting the unobtainable goals. As I testified at my deposition, it was my understanding that Prissert, Anderson and Bodman were all involved in setting the goals. However, it was Prissert, whom I learned controlled the issue. Since they had been my prior bosses whom I knew, I went to both Bodman and Anderson to complain about the unrealistic goal. Both told me that it was Prissert's decision and they had no control to change it. Exh. . Cargian Tr. 222:25-223:16; 225:15-226:14.

16 In addition to my sales responsibility for my expanded territory, I continued to have major responsibility and did substantial work for the Tourneau Corporate Account for which I did not receive bonus credit. Corporate bought for all Tourneau stores, I did the selling nationally, although the regional reps got the credit and bonus. For the main part, these sales were larger than the sales in most Breitling regions. My work included: weekly or bi-monthly meetings with the buyer, the assistant buyers and the buyer for the three Tourneau outlet doors, plus follow up on orders; analyzing sales data; together with Breitling management attending bi-annual review meetings with Tourneau; quarterly advertising and marketing meeting with our Marketing Director; overseeing accounts receivable; negotiating premium display positioning ;

providing monthly recap of sales; training Tourneau's telemarketing department, resolving sales service issues. In general I spent between 4 to 10 hours a week on corporate Tourneau matters.

17. The rational that I was given for this exorbitant increase—that my territory increased-- is contradicted by the record. Prissert Decl.¶ 32. First, at my deposition, I misstated when I said that I was given Delaware in 2011. That change actually occurred in 2009, a fact admitted to by Defendant. Goodman Aff. Exh   Resp to Admissions ¶ 13. It is true that No.Virginia, Maryland and DC, which Anderson had represented, were assigned to me. However that only represented a net addition of 5 new doors. Although originally there was a transfer of 11 new doors from Anderson, simultaneously, my New Jersey territory was transferred to Annie Sommer ("Sommer"), which represented the loss of 5 doors. Also, when the new territory was assigned, Breitling, who controls to whom we can sell, closed two of the stores in the new territory for whatever their reason.

18. Also, Josh Haley ("Haley") was given Anderson's very lucrative Florida territory, an increase also of 5 new doors, yet his goals were raised only $7 million contrasted to my $14M, representing a 60% increase contrasted to my 92% increase. Also, Breitling submitted figures which claim that Haley had 47 doors compared to my 40 doors, yet he had a significantly lower goal.. Defendant's Exh. K, Breitling 9063.

19. 2012 was a difficult year for Breitling USA, and all of the sales reps. It particularly presented many challenges to me since I still had an unfairly high sales goal.

    a. Until 2012 sales goals and bonuses were based on sales to Tourneau stores in your region. Until then I grossed about $4M in sales annually until it became a house account for which I received no credit for business or for bonus. Although this effected all of the regions,

6

it had the greatest impact on my business since my area produced the largest sales, by at least $2M.

      b. Although the reps no longer received sales credit or bonus for the Tourneau sales, we still had to service the Tourneau stores in our area, which means visiting them once a month to ensure that they maintained the sales cases in appealing fashion; conducting training, dealing with complaints on repairs or business, transmitting marketing and advertising program, educating staff on new models, and ensuring that the stores had current marketing material. Again, this was true for all the reps, but I had 7 stores compared with others who had 1 to 5 thus more of my time had to be spent on stores for which I received no bonus credit. Exh. C.

      c. In addition, I continued to service and assist in selling the corporate Tourneau account, which took about 4-10 hours per week for which I received no credit.

      d. In 2012 Breitling opened a discount boutique in Woodbury Mall, part of my territory. This boutique was a house account. It was both competitive with my customers and deprived me of selling remainders which I had previously done. I estimate that I lost at least $2 M the first year.

      e. Breitling had opened a prestigious Boutique on East 57th Street. Again this was a house account. This Boutique competed with customers in the area to whom I had sold, such as Kenjo, which was just across the street, and Wempe's which was around the corner. Again I would estimate a loss of about 2.5M the first year.

      f. In September of 2012 the east coast, particularly New York was hit by hurricane sandy which had a significant effect on business in general.

20. From time to time the sales reps would receive a Special Bonus, in addition to the regular bonus. These special bonuses under Bodman were usually distributed when Breitling had a particularly good year.

21 Breitling did not have an especially good year in 2012, thus why special bonuses were awarded is a question, particularly since plaintiff received one of the lowest special bonuses.. The overall increase in sales was 2.5% as compared with 2011 where the increase was 25.3.%. or 2010 when the increase was 34%. Cargian Aff.,Exh A, Pl. 0000280. The reps were never told that there was a formula used for determining the amount of the "special bonus"

22. Mid-December 2012 I learned that I was being demoted. Contrary to Prissert's statements, the promotion of Isaac Schafrath ("Schafrath") came before the division of territories, and Schafrath was told before anything was said to me. In December 2012 I was called in for a meeting with Prissert at the Connecticut office. On my way, I met Schafrath who told me that he had been promoted. From our conversation, I had the impression that he knew for a while.

23. I then went into my meeting with Prissert who told me that Schafrath was being given Northern Va,,Maryland and D.C., which were my territories, and because I had a reduced territory my salary would be reduced by $35,000, and my bonus potential by $10,000. He said something to the effect that it was too much work for me, although I had not said my territory was too much work. He also assigned me to do Corporate Sales, that is trying to get corporate clients to buy a large quantity of watches to give as gifts to their customers or employees. This was a new project assigned to me, not one that looked particularly lucrative. A whole new marketing strategy was required, which, along with Sommer, I had to devise without help from the marketing department. As evidence that this assignment was but a means to make me fail,

8

this program was never continued after my termination. It should, however, be noted that because I am a very good salesman and have many contacts, I was indeed able to sell Cadillac on the idea.

24. Although I liked Schafrath and supported his desire for advancement, I never supported him in any way for immediate promotion to sales rep, a position that he was clearly not ready for. I did recommend that he look into Inside Sales or Training, which had been the stepping stones for me, Haddad and Sommer. Susan McDonald ("McDonald") has been the Manager of Inside Sales since the mid-1990s. Inside sales is an excellent background for promo to sales rep because of its exposure to clients, knowledge of the product, knowledge of sales techniques. She had more experience than Schafrath.

25. Although Prissert was aware of the difficult business climate in 2012, particularly in New York City, and despite significantly reducing my territory, he did not take this into account when once again setting my goals unrealistically high. He increased my goals by 14% while the other reps (except Sommer) were increased 8%-10%.

26. On about December 17, 2013 I was called to a meeting with Prissert and Amstutz and told that my services were being terminated effective 12/31/13, but that I was to cease performing any duties for the company that day. When I asked the reason Prissert said "we just are not on the same page". He also said something to the effect that "you are a really smart guy—you could be doing bigger things, more important jobs, this job may be too small for you. " Nothing was said about my performance

27. In fact, although again everyone's sales were down, my sales performance in 2013, measured by increase over the prior year, was better than Criddle, whose sales were down 20.7% , Haley, whose sales were down 17.3%, and Haddad whose sales were down 14.7%. My sales

were down 13.8% In fact, no one increased sales, except Lambert and the House, but both had only about a $500,000 increase.   Exh.A.

28. Schafrath was retained as my headcount replacement.

**DISCRIMINATORY DISCIPLINARY TREATMENT**

29. It is absolutely untrue, as Prissert claims, that I ever violated company policy by giving cash gifts to support staff at Christmas time. Prissert Aff. ¶ 45.   I, along with other reps, gave holiday gifts to our personal assistant and to Ms. McDonald, the Inside Sales Manager. The only difference is that some of them gave gift cards, basically cash to purchase items at a store, or gifts themselves. I always thought people appreciated the cash more to do what as they wanted.

30. Nothing about my gift giving violated company policy.  Our employment contract provides that reps are obligated to follow the rules and procedures of the Employee Handbook. Def. Exh. I.  There is nothing in the Employees Handbook that prohibited these gifts, and to my knowledge there is still nothing in Handbook. See Figueroa Tr. 53:5-8.  Moreover, Bodman was always aware that I gave cash gifts and I believe Anderson also knew.  Neither ever raised an issue.  Prissert, as the new President, was free to change the rules, and I immediately stopped the practice as directed. However, since my behavior was always approved by the prior President and there was nothing in the Handbook that prohibited my giving cash gifts, only discriminatory animus accounts for Prissert's papering my file with a reprimand.

31. I did not yell and curse at Prissert in front of colleagues and customers as he alleges. Prissert Aff.¶¶ 46-47. In September of 2012 at the annual Reno Air Show, where Breitling traditionally takes many of its best customers and all of the reps, there was a dinner and bowling event scheduled for our customers. It is the responsibility of the reps, marketing personnel and

10

management to entertain the clients. After dinner, because we could not find the other staff members, and the restaurant was pressing us to leave, Sommer and I took it upon ourselves to escort about 40 of the Breitling customers to the bowling event which was about 5 blocks away. When we arrived there we found Prissert, together with Sales Manager Anderson, and sales reps Rick Lambert ("Lambert") and Beth Haddad ("Haddad") already bowling ,without any customers. I was mad. We were doing all of the work, with Prissert and Anderson simply playing as if they were guests. I did say something to the effect of "What the f". However, it was not directed at Prissert or anyone in particular. It was simply my frustration getting the best of me. The National Bowling Stadium, where the incident occurred, was huge with 78 lanes and Prissert and the others were tucked in a corner at least 15 feet away, very possibly more. Plus the bouncing bowling balls made it extremely noisy. I do not recall the clients being there since they had mainly left to get their shoes. It was a fleeting moment and I do not believe Prissert even heard my comments. As Sommers testified at her deposition, he was so far away and the remark was not directed at him. Sommer Tr. 87:16-89:13.

32. Nonetheless, without making any attempt to discuss with me the incident or to hear my side of the story, within a day I received a Warning Letter by e-mail and hard copy on letterhead, signed by Prissert himself, not the HR Manager, misstating the facts and reprimanding me. It was only after the Warning Letter was issued that Prissert met with me. Although I did apologize for losing my temper, I clearly explained the circumstances; and complained that it was unfair to leave Sommer and me with all of the responsibilities for the clients, who, for the main part, were not even our customers, while he with others played without any concern for the clients. I explained that this was just a general "what the f" not addressed to anyone in particular. Using the "f" word is hardly unusual at our work place, and Prissert along

with others indulge. Prissert did not apologize for leaving us to do the work, nor did he even address the issue.

33. As will be demonstrated by the exhibits attached to my attorney's affirmation, I was treated much more harshly than one of my colleagues, who committed major fraud and deception on the company, but who was not terminated.

34. Prissert claims that one of the reasons I was a bad employee is that I was disrespectful at the sales meeting in 2013. That is not true. I did however try to make a point about what to me was unfair treatment especially as it affected me. At that meeting Prissert had announced that the reps would be losing the comp time that they had accumulated. Those were days off to compensate for extra time worked. We were also told that the mandatory vacation week at Christmas time, and the mandatory week off in July were now going to be charged to our individual vacation. In other words, the company closed those two weeks, and until 2012 employees were paid for the days off and still were entitled to our full vacation. Also, I learned at this meeting that I was being given a 14% increase in my goals where the other reps were given 8-10% increases for the year, which meant the less likelihood of getting a significant bonus. These losses, together with earlier being told my salary was reduced by $35,000, was a substantial loss in compensation. I, therefore, did sarcastically say shouldn't the work week be reduced to go with the reduction in compensation. Although I did feel that I was being mistreated, I nonetheless continued to work as hard as ever, ending the year better than 3 of my colleagues.

**TREATMENT AS ONE OF THE GIRLS**

35. Prissert maintains a boys club atmosphere in the workplace which excluded me and the "girls" from his inner circle. It mainly focused around sports and sports gambling which were always subject of conversations between Prissert and a number of the male reps. It was clear that the women and me were never invited into this presidents more intimate circle of conversation. It may be hard to describe, but human experience tells us when we are being excluded or frozen out. It is not coincidence that the women and I all had the same reaction. perception is fully corroborated by deposition testimony given by Sommer, Roman, and Vessely; and by the written email of complaint by Haddad. Goodman Aff. Exh.

36. There is a general sexist ambiance in Breitling facilities that permeates the workplace. The sexist collateral material that the sales reps had to distribute to customers, were provided by the parent company and we were ordered to distribute. Goodman Aff. Exh. There was also the very provocative statue displayed at the 57th St. Boutique. I took the pictures of the statue, one of which is on the Breitling website, which are attached as Exh.E. On several occasions I did tell Bodman then subsequently Prissert that there were complaints and the material was inappropriate. I received no response, and we continued to be directed to distribute the material.

37. Exclusion from the president's inner circle resulted in specific work place discrimination:

    a. In July, 2013, Breitling had a premier event for major customers held at the Bentley factory in Crewe, England. Breitling and Bentley developed a partnership where Breitling designed a series of up to 20 watches with a Bentley logo. Sales arrangements for the Bentley line were different then ordinary watch sales. Stores had to dedicate extensive space and signage before Breitling would allow it to carry the Bentley watches. Each store had to sign separately to carry the Bentley line in which it made these extensive commitments. It was a very

13

expensive undertaking for the stores and therefore a difficult sell. As a consequence, there was a limited number of Bentley doors. The chart Anderson created shows that I had 25 Bentley doors. Def. Exh. K.

The Crewe event was a way to entertain our top clients, while promoting their sales of the Bentley watch. This was a major networking opportunity to impress our customers; to forge relationships; and to increase our sales for which a rep would receive bonus credit... All of the male reps were invited to participate, although Brian Criddle could not attend because of a family wedding. The only reps not invited were the two women and me. I was excluded despite the fact that a number of my customers were invited, and despite the fact that as Anderson's chart shows, I had 25 Bentley doors, while Rick Lambert and Peter Cawthorne had only 22 and 14 respectively. I also have another strength. I am a car enthusiast with great knowledge of the Bentley lines as well as most every other car. I, therefore, could have shared lots of good information.

b. There is a Breitling marketing event at the annual air show in Buochs, Switzerland. Before 2011 only the President and marketing folk attended from the U.S. Starting 2011 Prissert brought Anderson and several of the male representatives. I was never asked to attend nor were any of the female reps.

c. In 2011, I was assigned to share a hotel room at a business conference in Basel, Switzerland with my female colleague, Sommer. Neither of us requested that arrangement and it is my understanding that management at Breitling submitted the room assignments to Breitling SA, which makes the arrangements. Sommer was particularly upset with the arrangement. I wrote to Monica Pirens of the Swiss corporate office to see if we could at least get a large suite type room that would allow for more privacy When I said in that letter that for 18 years we had

14

been sharing rooms, what I was clearly referring to is the fact that the annual meeting in Basel is so crowded that participants always had to share rooms. More often than not I was assigned to share a room with Rick Lambert. Once, about 10 years earlier, Sommer and I were assigned to share a room, but I assume Bodman made sure that that did not happen again while she was still President.

38. In 2011, I did request to be relieved of the newly assigned South Virginia territory. It was not because it was too much work, but because of the travel. I would lose a day traveling to the new area from my other territory, which was not quite worth it, since there were only a few accounts.

_____
FREDERICK M. CARGIAN

Sworn to before me this
11th day of March, 2016

_____
Notary Public

JANICE GOODMAN
Notary Public, State of New York
No. 02GO6591630
Qualified in New York County
Commission Expires May 31, 2018