**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FREDERICK M. CARGIAN

                     Plaintiff,

    -against-

BREITLING USA, INC.,

                    Defendant.

:   <u>MEMORANDUM DECISION</u>
:   <u>AND ORDER</u>

:   15 Civ. 1084 (GBD)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

Plaintiff Frederick M. Cargian ("Cargian") brings this action against former employer Defendant Breitling USA, Inc. ("Breitling") for sexual orientation discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. ("NYSHRL"), and the Administrative Code of the City of New York §§ 8-107 et seq. ("NYCHRL"). (Complaint, ECF No. 1, ¶ 1.)

This case comes before this Court on Defendant's renewed motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 to dismiss Plaintiff's claim for discrimination under Title VII and to dismiss Plaintiff's state and city law causes of action. (Def.'s Letter Brief in Support of Renewed Mot. for Summ. J. ("Def.'s Brief"), ECF No. 84, 1.) On September 29, 2016, this Court granted Defendant's first motion for summary judgment. (Mem. Decision and Order dated September 29, 2016 ("September 2016 Decision"), ECF No. 68, 1.) On appeal, the Second Circuit vacated the September 2016 Decision based on its decision in *Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018) (en banc), "which addresse[d] this Circuit's jurisprudence on sexual orientation discrimination under Title VII." *Cargian v. Breitling USA, Inc.*, 737 F. App'x 41, 42 (2d Cir. 2018). The Second Circuit instructed this Court "to consider whether in the first

instance Plaintiff's claims can survive a motion for summary judgment after *Zarda* altered that legal landscape." The Circuit "express[ed] no opinion as to the proper resolution of Cargian's Title VII and related claims on remand." *Id.*

Defendant's Summary Judgment motion is GRANTED.

## I.   FACTUAL BACKGROUND

Defendant Breitling sells and distributes "Breitling" brand watches in the United States. (Def.'s 56.1 Stmt., ECF No. 40, ¶ 5.) Breitling employs sales representatives to sell its products. (*Id.* ¶ 3.) Sales representatives are assigned a geographic territory within the United States and are responsible for making sales in that area. (*Id.* ¶ 7.) In 2011 and 2012, Breitling employed seven sales representatives. (*Id.* ¶ 100.) Breitling employed eight sales representatives in 2013. (*Id.* ¶ 119.)

Breitling hired Plaintiff in 1990 as a training manager. (Def.'s 56.1 Stmt. ¶ 4.) Plaintiff was promoted to sales representative in 1992, and he continued in that position until he was terminated on December 12, 2013. (*Id.* ¶ 158.)

**Breitling Management**

Defendant's sales representatives are supervised by members of Breitling management, including the president of the company. The president of Breitling is responsible for assigning each sales representatives' territory, setting sales goals, and determining salary and bonuses. (Def.'s 56.1 Stmt. ¶¶ 10, 30, 52.)

From the time Plaintiff was hired through January 2011, Marie Bodman was the president of Breitling. (Affidavit of Frederick Cargian ("Cargian Aff."), ECF No. 48, ¶ 3.) Thierry Prissert, who replaced Bodman after she left, was initially hired in September 2010. (Def.'s 56.1 Stmt. ¶ 16.) Prior to assuming leadership, Prissert had a transition period in which Bodman educated him

on various business practices. (Def.'s 56.1 Stmt. ¶ 18.)  In January 2011, Prissert assumed the full duties of president, including direct supervision of the sales representatives. (*Id.* ¶¶ 15, 18.)

**Plaintiff's Responsibilities**

Cargian's duties as a sales representative included increasing sales in the geographic territory assigned to him by the Breitling president; achieving the sales goals set by Breitling management at the beginning of each calendar year; selling wholesale Breitling watches to retail dealers; traveling to each account or point of sale in the territory and meeting with the retail agents; helping work on displays and the presentation of Breitling product in retail stores; helping train retail agents on the Breitling brand, products, and history; opening new points of sale for Breitling watch sales; providing weekly activity reports to Breitling management; and ensuring each account in his territory had the correct product and inventory. (*Id.* ¶ 6.)

**Plaintiff's Work and Sales Performance**

On July 16, 2012, Charles Anderson, the national sales manager for Breitling, sent Plaintiff an email attaching his June 30 sales results, and stated "[t]here are some concerns with the results." (*Id.* ¶¶ 20, 77.)  Shortly after, on July 23, 2012, Prissert reduced Plaintiff's sales goal and sent an email stating, "[h]ope you can catch up to the $15,400,000 target . . . Good luck to you . . ." (*Id.* ¶ 78.)  On September 26, 2012, Prissert sent Plaintiff an email stating,

> We are very concerned that the results in your region are still far behind expectations and also the only region double digit down versus last years numbers ... you are -19% versus 2011 ... the only other region behind last year is -3% versus last year ... In 2011, your territory was already the least performing one (growth over 2010) which means, as we discussed several times, that Breitling business is 'melting' in the Northeast 1 [sic] and we are loosing [sic] market share in your area since January 2010 ... I am very concerned that you might not reach any of the goals, we set in January, (quantitative and qualitative) for your territory ... We are running out of time.

(*Id.* ¶ 81.)  On October 5, 2012, Anderson emailed Plaintiff that "[w]ith respect to your region, we see that the total sell [sic] is the most challenged area for B[reitling] USA down 19.9% versus 2011 YTD." (*Id.* ¶ 104.)  On March 5, 2013, Prissert sent Plaintiff an email stating, in part, "[y]our region has suffered a lot over the last two years and falling short this year is not an option." (*Id.* ¶ 82.)  Prissert sent Plaintiff a similar email four months later, on June 4, 2013:

> I am concerned in the trend of your numbers … We heave [sic] been repeating again and again that your schedule of visits is too light and that you should spend more time at the store … Your results … show me that you are not really using all the tools you have or capitalizing on opportunity … In other words, you keep doing it you ways and ate [sic] the pace you think is right … I just want to reiterate that achieving your target is key to us and for you (especially this year, after your region has been reduced so you can focus on less accounts and be more productive) … Finally, I want you to succeed and achieve your goals but I am not sure you are doing all you can and need to be doing to make it happen.

(Def.'s 56.1 Stmt. ¶ 84.)

Regarding his store visits, for example, on October 19, 2010, Bodman responded to an email from Plaintiff regarding his store visits, stating "my problem .. [sic] and I will not care very soon anymore (but I should warn you that the next wave of leader will not accept it) is that visiting 4 doors in 4 days is not what someone who makes over 200K a year can keep on doing." (October 19, 2010 Email from Bodman to Cargian ("October 19 2010 Email"), ECF 39-4, Ex. L, 1.) Similarly, After Prissert assumed leadership, on June 14, 2011, Prissert sent Plaintiff an email stating:

> I am almost speechless when I read your call report … No visits on June 7 and 8..??!…That is not at all what I expect from you or any other rep, furthermore that [sic] we agreed to reduce your territory last Thursday (because you said you were overwhelmed and was [sic] working too much) and expect you to schedule travel and visit more accounts ever [sic] week…

(Def.'s 56.1 Stmt. ¶ 74.)

Plaintiff's sales performance declined from 2011 through 2013. In 2011, Plaintiff made total sales of $18,767,811 and achieved 79% of his sales goal. (*Id.* ¶¶ 98-99; PowerPoint Slide of Breitling Sales Figures ("2013 PowerPoint"), ECF No. 39-3, Ex. K.) Plaintiff achieved the lowest percentage of his sales goals compared to other sales representatives in 2011, missing his sales goal by $4,992,189. (Def.'s 56.1 Stmt. ¶¶ 101, 109.) In 2012, Plaintiff made total sales of $12,899,581 and achieved 83.76% of his sales goal. (*Id.* ¶ 109.) Plaintiff's sales were $938,000 lower than his sales in the same area in 2011 (a decrease of 6.79%). (*Id.* ¶ 112.) Plaintiff again achieved the lowest percentage of his sales goal as compared to the other Breitling sales representatives in 2012. (*Id.* ¶ 111.) Plaintiff missed his 2012 sales goal by $2,500,419. (*Id.* ¶ 109.) In 2013, Plaintiff's total goal was $11,200,000. (*Id.* ¶ 114.) In September of 2013, Plaintiff's goal was reduced to $10,640,000. (*Id.* ¶ 115.) That year, Plaintiff made total sales of $8,452,072 and achieved 79% of his sales goal. (*Id.* ¶ 118.) Plaintiff was tied for achieving the lowest percentage of his sales goal in 2013. (*Id.* ¶ 120.)

**Plaintiff's 2011-2013 Sales Goals**

At the 2010 yearly performance review meeting in early 2011, Bodman assigned Plaintiff a sales goal of $24,950,000. (*Id.* ¶ 95.) Plaintiff's 2011 sales goal was a 92% increase over his 2010 sales goal. (Tr. of Deposition of Thierry Prissert ("Prissert Dep."), ECF No. 39-1, Ex. E, 165:2-13.) Plaintiff's sales goal in 2012 was $16,500,000. (Def.'s 56.1 Stmt. ¶ 105.) In July of 2012, Plaintiff's goal was reduced to $15,400,000. (*Id.* ¶ 107.) Plaintiff's total goal in 2013 was $11,200,000. (*Id.* ¶ 114.) In September of 2013, Plaintiff's goal was reduced to $10,640,000. (*Id.* ¶ 115.)

**2011 Sales Conference**

In 2011, Plaintiff was assigned to share a room with Anne Sommer, a sales representative and friend of Plaintiff, during a business conference in Switzerland. (Def.'s 56.1 Stmt. ¶ 140). In connection with the hotel room assignment, Plaintiff emailed the head of events at Breitling Switzerland requesting a specific kind of room for himself and Sommer, stating

> Annie and I are rooming together this year because of the mix of men and women from the US. I wanted to ask if Annie and I could get one of the larger rooms at the plaza? We had the room one year when Annie and I stayed together years ago. The room has a few extra square feet of space making it better suited for dual genders staying together. Maybe the room was on floor six? Kind of an "L" shape? With the windows that go to the ceiling? I also know the rooms are very hard to come by, but in this instance it would be nice. Annie and I have shared rooms all the years we have attended. I think this is my 18th, Annie's 17th. No hierarchy here. You don't even have to email me back. Whatever the room is when we arrive we will gladly stay in. But, I did want to ask as it makes sense now rather than later.

(Def.'s 56.1 Stmt. ¶ 41.)

**Disciplinary Action**

On September 18, 2012, Plaintiff received a written warning from Prissert for cursing in front of colleagues and clients at a bowling event in Reno on September 16, 2012. (*Id.* ¶ 93.) Prissert met with Plaintiff regarding the incident after sending the warning. (Cargian Aff. ¶ 32.) During the meeting, Plaintiff admitted to "losing his temper" and swearing at the event. (*Id.* ¶¶ 31-32.) Specifically, Plaintiff stated:

> Although I did apologize for losing my temper, I clearly explained the circumstances; and complained that it was unfair to leave Sommer and me with all the responsibilities for [escorting 40 clients of Breitling customers a bowling event 5 blocks away] , who, for the main part, were not even out [sic] customers, while [Prissert] with the others played [bowling] without any concern for the clients. I explained that this was just a general "what the f" not addressed to anyone in particular.

(Cargian Aff ¶¶ 31-32.) Prissert made the decision to issue Cargian the warning. (Def.'s 56.1 Stmt. ¶ 155) Breitling did not conduct any internal investigation prior to issuing the written warning. (*Id.* ¶ 93 .) The following year, another employee, Brian Criddle, was issued a written warning for misrepresenting his customer visits, submitting false expense reports to Breitling for personal expenses, and misusing the Breitling credit card. (*Id.* ¶ 152.) Prissert made the decision to give Criddle a warning. (*Id.* ¶ 156.) Prior to issuing the warning, Breitling conducted an investigation. (*Id.* ¶ 153.)

**Plaintiff's Territory Reduction**

At the end of 2012, Prissert made the decision to split Cargian's territory. (Def. 56.1 Stmt. ¶ 130-131.) As a sales representative, Plaintiff's territory was subject to adjustment by management. (*Id.* ¶ 9.) In 2011, Anderson was promoted from sales representative to national sales manager, and at that time Bodman transferred responsibility for the territory formerly serviced by Anderson to Plaintiff. (*Id.* ¶¶ 123-124.) This assignment added 20 store accounts to Plaintiff's territory. (Prissert Dep 165:2-13.)

At the end of 2011, Prissert made the decision to split Plaintiff's territory, along with the Sommer's territory, because Plaintiff and Sommer "were not performing at all at the end of the year of 2012, and I wanted to give them a chance to succeed on a smaller territory in order to be successful because they were not handling the larger territory in the right manner." (Prissert Dep. 87:19-24). Prissert further explained,

> That the territories [] were not successful; the sales were not where we needed them to be, which means the salespeople were not achieving goals and were not performing; therefore, I needed to restructure the territory in order to be successful. Then it meant I needed to add somebody. And then, at the same time—it was a decision that was at the same time. You need to split to make some territory shorter to give a chance to some people to be successful

and continue doing business in the company, but then it means you have to cover some more territories, so then you need somebody else.

(*Id.* 88:13-89:3.)

**Salary Reduction**

At the same time Prissert reduced Plaintiff's territory, he also made the decision to reduce Plaintiff's base salary by $35,000. (Def.'s 56.1 Stmt. ¶¶ 59, 63.) At the time of Prissert's decision, Plaintiff's base salary was $230,000. (*Id.* ¶ 59.) In 2013 Plaintiff's base salary was set at $196,000. (*Id.* ¶¶ 133-34.)

Prissert made the decision to cut Plaintiff's salary because "the territory [Plaintiff] would be covering was significantly reduced from the year before, and [he] would be responsible for fewer doors/accounts and thus fewer visits, less time commitment, and overall less responsibility." (Affidavit of Thierry Prissert ("Prissert Aff."), ECF No. 39-1, ¶¶ 36.)

**Defendant's Promotion of Isaac Schafrath**

At the end of 2012, Prissert made the decision to promote Breitling employee Isaac Schafrath from the position of vault manager to sales representative in order to take over the territory removed from Plaintiff and Ms. Sommer. (Def. 56.1 Stmt. ¶¶ 39, 137.) Prissert decided to promote Schafrath because: (1) Prissert preferred to promote someone from within the company, (ii) he wanted to give a chance to an employee of the company who had worked for Breitling for many years, (iii) he believed Schafrath was performing well in his current job, (iv) Schafrath had expressed a desire to do something else within the company, (v) Schafrath knew the Breitling brand very well, and (vi) Schafrath knew Breitling products very well. (Prissert Dep. 92:19-94:2.)

Schafrath knew Prissert from conversations in the lunchroom and working with him. (Tr. Isaac Schafrath Deposition ("Schafrath Dep."), ECF No. 74-7, Ex. 14, 118:25-119:18.) Schafrath

did not have sales experience prior to becoming a sales representative. (Def.'s 56.1 Stmt. ¶ 138.)
Prior to his promotion, Schafrath had worked at Breitling as a vault manager for 6 years. (*Id.* ¶¶
136-137.) Schafrath expressed an interest in promotion to sales representative, and repeatedly
made requests to do so to both Bodman and Prissert. (Schafrath Dep. 87:4-18.)

At some point in late October of 2012, Schafrath had an "informal conversation or two
with Chuck and/or Thierry just saying that they were hoping they might be able to find a place for
me." (Schafrath Dep. 108:3-23.) Schafrath was offered the position of sales representative in
November 2012. (*Id.* 126:21-127:16.) Schafrath did not perform well as a sales representative.
(Prissert Dep., 93:8-94:2.) Discussing Schafrath's poor performance, Prissert stated,

> I thought that somebody who had the knowledge of the [product]
> line as Mr. Schafrath, because he worked in the vault for many years,
> he knew the brand very well, he knew the product perfectly, which
> are two assets that are very important to be a good sales rep, so I
> thought he would be a good candidate. And promoting from the
> inside is always something that I prefer to do than going to hire
> people from the outside. I thought he would be successful. I made a
> mistake, because he was not successful.

(*Id.* 93:14-92:2.)

**Plaintiff's Termination**

In December of 2013, Prissert informed Plaintiff that his contract would not be renewed.
(Def.'s 56.1 Stmt. ¶ 157.) Prissert made the decision to terminate Plaintiff because Plaintiff did
not meet his sales goals for three years consecutively, and because he was consistently one of the
lowest sales performers amongst all the sales representatives. (*Id.* ¶ 158; Prissert Aff. ¶¶ 41-42.)
Prissert also decided to terminate Plaintiff because "he consistently exhibited a negative attitude
towards management." (Prissert Aff. ¶ 41.) Specifically,

> (a) Plaintiff had openly yelled at and cursed at me in front of
> colleagues and customers at the Reno bowling alley; (b) some of his
> sales accounts/customers had expressed to Breitling management

that Plaintiff was bitter and unhappy with his job at Breitling; (c)
Plaintiff had publicly exclaimed at a meeting in front of the other
sales representatives that he would only work "9 to 5" (despite the
job of a sales representative requiring significantly more time); (d)
Plaintiff had regularly resisted any kind of constructive criticism and
had expressed to me and to others numerous times that he knew how
to do his job and needed no guidance or performance criticism
(despite declining sales numbers); (e) Plaintiff had failed to
consistently visit all of his accounts and resisted suggestions that he
should make more visits to his accounts; (f) Plaintiff in a self-
evaluation that he would better be suited as President of the
Company; and (g) Plaintiff resisted using new tools and
methodology Breitling required him to use, such as the Ipads and
the tracking system that Breitling had required all sales
representatives to use.

(Prissert Aff. ¶ 49.) Following Plaintiff's termination, Defendant did not hire a

replacement. (Def.'s 56.1 Stmt. ¶ 160.)

**Plaintiff's Discrimination Allegations**

Plaintiff asserts that he began experiencing discrimination after Prissert became president

of Brietling in 2011. (Pl.'s Opp. 3.) Specifically, Plaintiff alleges that (1) Prissert created and

maintained a "boys club atmosphere in the workplace" wherein "sports and sports gambling []

were always subject of conversation," (Cargian Aff ¶ 35); (2) in 2011 Prissert increased Plaintiff's

sales goal by 92% over his 2010 goal, while John Halely, a heterosexual male sales representative,

only received an increase of 63%, (Pls. Opp. 12); (3) in 2011, Defendant assigned Plaintiff to share

a hotel room with a female sales representative during a business conference in Switzerland (*id.* ¶

37(c)); (4) in 2012, Prissert disciplined Plaintiff for inappropriate behavior at a work event with

less due process than a heterosexual male colleague who submitted false expense reports, (Pls.

Opp. 19-20); (5) in 2012, Prissert reduced Plaintiff's territory and salary, while Patrick Cawthorne,

a heterosexual male sales representative who also had his territory reduced, did not have his salary

reduced, (Pl.'s Opp. 14); (6) in 2012 and 2013 Plaintiff was not invited to a Breitling marketing

event at the annual air show in Buochs, Switzerland even though several of the male sales representatives were invited (Cargian Aff. ¶ 37(b)); (7) in July 2013, Plaintiff was not invited to a marketing event at the Bentley factory in Crew, England to which all male representatives were invited (Cargian Aff. ¶ 37(a)); and (8) Prissert terminated Plaintiff in 2013 and replaced him with an unqualified heterosexual man, (Pl.'s Opp 5).

## II.   LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material when it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute of fact is genuine "if the evidence is such that a jury could return a verdict for the nonmoving party." *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson*, 477 U.S. at 248.)  For a genuine dispute regarding a material fact to warrant a jury trial, there must be sufficient evidence supporting the claimed factual dispute "to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249.  "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

"[T]he court is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004).  However, a court is not required to draw any inference that is "blatantly contradicted by the record, so that no reasonable jury could believe it . . . for the

purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 US 372, 380.  To defeat a motion for summary judgment, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted).  "[S]ummary judgment may be appropriate even in the fact intensive context of discrimination cases."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 465 (2d Cir. 2001).

### III.   DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS FOR DISCRIMINATION UNDER TITLE VII AND NYSHRL

Defendant argues that it is entitled to summary judgment because Plaintiff cannot demonstrate a prima facie case of discrimination, nor can Plaintiff show that Defendant's nondiscriminatory reasons for the adverse employment action are a pretext for discrimination due to Plaintiff's sexual orientation. (Def.'s Brief 1.)  In his opposition, Plaintiff argues that he meets the de minimis burden for establishing a prima facie claim of sexual orientation discrimination based on the fact Plaintiff was "replaced by a significantly less qualified heterosexual man." (Plaintiff's Opposition to Defendant's Renewed Motion for Summary Judgment ("Pl.'s Opp"), ECF No. 85, 9.)  Plaintiff also argues that there are genuine issues of material fact regarding Defendant's nondiscriminatory reasons, which must be resolved at trial. (*Id.* 11.)

Under Title VII, it is "unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  In 2020, the Supreme Court held that "homosexuality and transgender status are inextricably bound up with sex" and that "to discriminate on these grounds requires an employer to intentionally treat individual employees

differently because of their sex." *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1741-2 (2020) *affirming Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 112 (overruling precedent to hold that "sexual orientation discrimination is motivated, at least in part, by sex and is thus a subset of sex discrimination . . . which is an impermissible basis for adverse employment actions"). Accordingly, Title VII prohibits an employer from discriminating against an employee on the basis of sexual orientation. *Id.*

Under NYSHRL, it is "an unlawful discriminatory practice" for an employer, based on an individual's gender or sex, "to discharge from employment ... or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). *Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 323 (S.D.N.Y. 2020)

Claims under Title VII and NYSHRL are analyzed pursuant to the three-part burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-04 (1973), in the absence of evidence of direct discrimination. *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 74 (2d Cir. 2016). Under this framework, plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Id.* If plaintiff establishes a prima facie case, a rebuttable "presumption that the employer unlawfully discriminated against the employee" arises. *St. Mary's Honor Center, et al., v. Hicks*, 509 US 502, 506 (1994). The burden then shifts to "the employer to articulate some legitimate, non-discriminatory reason" for the adverse employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802. If defendant carries its burden of production, the presumption from plaintiff's prima facie case is rebutted and drops away. *St. Mary's Honor Center*, 509 U.S. at 507. The burden then returns to and rests on plaintiff, who has "the ultimate burden of persuading the trier of fact that defendant intentionally discriminated against the plaintiff . . .[.]" *Id.* A defendant is entitled to summary judgment if plaintiff cannot show, when given a

full and fair opportunity to establish his claim, that discrimination against plaintiff based on his membership in a protected class was the true reason for plaintiff's adverse employment action. *Id.*

Plaintiff has established a prima facie case for discrimination. However, Plaintiff has failed to raise a genuine issue of fact regarding Defendant's non-discriminatory reasons for Plaintiff's adverse employment action, nor has Plaintiff shown that Defendant's reasons are a pretext for discrimination.

## A. Plaintiff Has Established a Prima Facie Case of Discrimination

Brietling does not dispute that Cargian can establish the first three elements of his prima facie case. Instead, Brietling argues that Cargian has failed to make a prima facie case for discrimination because Plaintiff does not allege "direct evidence of discrimination, nor is there any evidence in the form of remarks or actions showing animosity towards Plaintiff's sexual orientation." (Def.'s Brief 4.) In response, Plaintiff argues that his allegation that he was replaced by Isaac Schafrath, a heterosexual man outside Plaintiff's protected class, is sufficient to carry his burden of establishing a prima facie case for discrimination. (Pl.'s Opp. 4.)

To establish a prima facie case for discrimination, plaintiff must show (1) that he is a member of a protected class; (2) that he was qualified for his position; (3) that he suffered adverse employment action; and (4) that the circumstances under which the adverse employment action occurred give rise to an inference of discrimination based on plaintiff's membership in the protected class. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). A plaintiff's burden of proof at this stage of the analysis is "de minimis." *Abdu-Brisson*, 239 F.3d at 466 (citations omitted).

An inference of discrimination can arise from circumstances including an "employer's criticism of the plaintiff's performance in "ethnically degrading terms; or its invidious comments

about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015). In determining whether the plaintiff has carried its burden of showing 'circumstances giving rise to an inference of discrimination,' "the function of the court is to determine whether the "proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir. 1995)

Plaintiff has established a prima facie case for discrimination. Plaintiff is a member of a protected class under Title VII and NYSHRL. (Def.'s 56.1 Stmt. ¶ 151.) Plaintiff was qualified for his position. (*Id.* ¶ 158.) Plaintiff has shown that he experienced two adverse employment actions. First, in 2012 Defendant reassigned a significant portion of Plaintiff's territory and reduced his base salary by $35,000. (*Id.* ¶¶ 59, 63.) Second, in 2013 Defendant terminated Plaintiff. (*Id.* ¶ 157.) Lastly, Plaintiff's reduction in territory, salary, and his termination took place under circumstances giving rise to an inference of discrimination. Defendant made the decision to split Plaintiff's territory near the time it made the decision to promote Schafrath and assign him Plaintiff's former territory. (Def.'s 56.1 Stmt. ¶¶ 39, 137.) This is sufficient to permit a rational finder of fact to infer a discriminatory motive. *Cronin*, 46 F.3d at 204; *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) ("[t]he mere fact that plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie case stage of the Title VII analysis")

Accordingly, Plaintiff has established a prima facie case for discrimination, thereby creating a rebuttable presumption that Defendant unlawfully discrimination against Plaintiff.

**B. Defendant Has Presented Legitimate Non-Discriminatory Reasons for Plaintiff's Adverse Employment Action**

Defendant argues that it is also entitled to summary judgment because it has presented legitimate non-discriminatory reasons for Defendant's decision to reduce Plaintiff's territory and salary in 2012, and to terminate Plaintiff in 2013, which Plaintiff fails to rebut. (Def.'s Brief 5-6.) In response, Plaintiff argues that summary judgment is inappropriate because his testimony raises issues of fact that must be resolved by trial. (Pl.'s Opp. 11.)

To rebut the presumption of unlawful discrimination created by plaintiff's prima facie case, defendant employer must "articulat[e] legitimate and non-discriminatory reasons for the adverse employment action." *Abdu-Brisson*, 239 F.3d at 468. "[D]efendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination did not cause their actions." *St. Mary's Honor Ctr.*, 509 U.S. at 507. If defendant carries its burden of production, "the presumption raised by the prima facie case is rebutted and drops from the case." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). Defendant has presented non-discriminatory reasons for Plaintiff's adverse employment action.

With regards to Plaintiff's reduction in territory and salary, Defendant asserts that it made the decision to reduce Plaintiff's territory because Plaintiff performed poorly in 2012, and Defendant wanted to give him a chance to succeed in a smaller territory with less responsibility. (Def.'s Brief 6-7.) In support, Defendant has presented evidence that Plaintiff missed his 2012 sales goal by $2,500,419. (Def.'s 56.1 Stmt. ¶ 109.) Defendant has also shown that Plaintiff realized the lowest percentage of his sales goal compared to other Breitling sales representatives, achieving 83.76% of the goal set by management. (*Id.*) Additionally, Defendant has shown that management emailed Plaintiff regarding Defendant's performance concerns several times throughout 2012. Notably, on September 6, Prissert emailed Plaintiff that "the results in your

16

region are [sic] still far behind expectations and also the only region double digit down versus last years numbers . . . I am very concerned that you might not reach any of the goals, [sic] we set in January . . . for your territory. (*Id.* ¶ 81.) Similarly, on October 5, 2012, Anderson emailed Plaintiff that his region "is the most challenged area for B[reitling] USA down 19.9% versus 2011." (*Id.* ¶ 82.) Defendant has also presented deposition testimony from Prissert explaining that he chose to split Plaintiff's territory because he wanted to "give a chance to [Plaintiff] to be successful and continue doing business in the company." (Prissert Dep. 88:13-89:3.) Defendant's reasons, which are supported by admissible evidence, are sufficient to permit a trier of fact to conclude that unlawful discrimination was not the basis for Plaintiff's 2012 reduction in territory and salary. *St. Mary's Honor Center*, 509 U.S. at 507. *See e.g.*, *Emanuel v. Oliver, Wyman & Co., LLC*, 85 F. Supp. 2d 321, 333 (S.D.N.Y. 2000) (granting summary judgment where evidence showed plaintiff performed his job responsibilities badly and that he received negative feedback directly from directors afterwards).

With regards to Plaintiff's termination, Defendant asserts that it decided to terminate Plaintiff because (1) Plaintiff performed poorly for three consecutive years, and (2) Plaintiff exhibited a negative attitude towards management and his work. (Def.'s Brief 6.) In support of its reasons, Defendant has presented admissible evidence that in 2011 and 2012, Plaintiff achieved the lowest percentage of the sales goal assigned by management of any Breitling sales representative. (Def.'s 56.1 Stmt. ¶ 101, 109.) In 2013 Plaintiff tied with one other sales representative to achieve the second lowest percentage of his sales goal. (Def.'s 56.1 Stmt. ¶ 101, 109.) With regards to Plaintiff's negative attitude, Defendant has presented evidence that in 2012 Plaintiff cursed at Prissert in front of customers and clients during a Breitling marketing event in Reno, Nevada. (Prissert Aff. ¶ 49.) Defendant has also presented evidence that, on another

occasion, during a meeting with colleagues in 2012, Plaintiff stated that he would only work from 9-5 "despite the job of sales representative requiring significantly more time." (*Id.*)   Additionally, Defendant has presented evidence that Plaintiff failed to consistently visit his store accounts, despite repeated guidance from Breitling management. (Def.'s Brief 6.)   In particular, on October 10, 2010, Bodman emailed Plaintiff that "visiting 4 doors in 4 days is not what someone who makes over 200K can keep doing" and warned him that "the next wave of leader will not accept it." (October 19 2010 Email 1.)   Similarly, on June 14, 2011, Prissert emailed Plaintiff that he was "almost speechless" after reading Plaintiff's report on his store visits, noted that "we agreed to reduce your territory last Thursday (because you said you were overwhelmed and was [sic] working too much) and expect you to schedule travel and visit more accounts ever [sic] week..." (Def.'s 56.1 Stmt. ¶ 74.)   Defendant's supported reasons for Plaintiff's termination are sufficient to permit a trier of fact to conclude that unlawful discrimination was not the basis for the adverse action. *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 575 (S.D.N.Y. 2010) (summary judgment granted where defendant supported reason for termination with evidence of well-documented performance shortcomings).

In his opposition, Plaintiff argues that summary judgment is not appropriate because "[t]he facts of the alleged [Reno] incident are hotly disputed with both Cargian and Sommer contradicting Prissert's uncorroborated allegation," (Pl.'s Opp. 20), thereby creating an issue of fact that must be resolved at trial, (*Id.* 11).   In support, Plaintiff points to his own affidavit and an excerpt from the Sommer deposition. (*See* Cargian Aff ¶¶ 31-32; Tr. Deposition of Anne Sommer, ECF No. 47-5, Ex. 12, 60:11-11.)   However, both Plaintiff and Sommer's testimony confirms that Plaintiff lost his temper and cursed at the Reno Event where customers, clients, and colleagues were present. (*Id.*)   Plaintiff argues that while he did curse at the event, "it was not directed at Prissert or anyone

in particular." (Cargian Aff ¶ 31.) This discrepancy is insufficient to create a genuine issue of fact regarding Defendant's second reason for terminating Plaintiff.

As Defendant has presented admissible evidence supporting its non-discriminatory reasons for Plaintiff's adverse employment action, which Plaintiff fails to dispute, Defendant has carried its burden of production and the presumption of unlawful discrimination created by Plaintiff's prima facie case drops away.

## C. Plaintiff Has Not Demonstrated that Defendant's Non-Discriminatory Reasons Were a Pretext for Discrimination

Plaintiff argues that Defendant's reasons for his adverse employment action are a pretext for discrimination because Defendant's reasons are contradictory and unworthy of credence, (Pl.'s Opp. 12), and that the true reason was because Prissert wanted to remove Plaintiff and replace him with a "heterosexual male with whom he could talk sports." (*Id.* 20.) In response, Defendant argues that Plaintiff has failed to establish pretext because he does not offer any evidence showing that Defendant's reasons for its decision to split Plaintiff's territory, reduce Plaintiff's base salary, and terminate Plaintiff were untrue, or that Defendant's decisions had anything to do with Plaintiff's sexual orientation. (Def.'s Reply 5-9.)

Once defendant rebuts the presumption of discrimination, the burden shifts back to the plaintiff, who must prove that the employer's stated reasons are merely pretext for a discriminatory motive to avoid summary judgment. *Weiss*, 2008 WL 821813, at *4. "The plaintiff has the ultimate burden of persuasion to demonstrate that the challenged employment decision was the result of intentional discrimination." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995).

A plaintiff proves an employer's reasons are a pretext for discrimination by showing "the reason was false and that discrimination was the real reason." *Gallo*, 22 F.3d at 1225. An employee can also establish that it was a victim of intentional discrimination "by showing that the

employer's proffered explanation is unworthy of credence." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000). A plaintiff shows defendant's reasons are unworthy of credence "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, [nondiscriminatory] reasons for its action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). "From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.*

Plaintiff may also establish the employer's proffered reasons are pretextual by showing that discrimination was a "motivating factor" in the employer's mind. *Fields v. New York State Off. of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 121 (2d Cir. 1997). To show that discrimination was a motivating factor in his adverse employment action, "plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 61 (2d Cir. 1997).

Here, Plaintiff has failed to present evidence in support of his argument. Plaintiff contends that Defendant's proffered reasons for reducing Plaintiff's sales territory and salary were a pretext for discrimination because (1) Prissert was "laying the groundwork to terminate Cargian and promote Schafrath in the spring of 2012 . . . before Cargian's performance results were known," (Pl.'s Opp. 14), (2) "notwithstanding having less territory to make sales, Prissert substantially increased Plaintiff's sales goals once more," (Pl.'s Opp. 13), and (3) Patrick Cawthorne, heterosexual male colleague, also had his territory reduced in 2012 but did not receive any reduction in salary, (*Id.* 14.) However, Plaintiff has failed to present evidence from which a reasonable finder of fact could conclude that Defendant's proffered reasons for his territory and salary reduction are false or unworthy of credence. First, with regards to Plaintiff's 2013 sales goal, the only evidence in the record shows that it was decreased significantly after Plaintiff's

territory was reduced in 2012.  Plaintiff's sales goal in 2012 was $16,500,000, later reduced to $15,400,000.  (Def.'s 56.1 Stmt. ¶¶ 105,107.)  Plaintiff's sales goal in 2013, on the other hand, was $11,200,000, later reduced to $10,640,000.  (*Id.* ¶¶ 114-15.)

Second, Plaintiff has not presented evidence that Schafrath's promotion took place before Defendant had knowledge of Plaintiff's 2012 sales, or that it was otherwise unrelated to Plaintiff's poor sales performance.  Defendant offered Schafrath promotion in November 2012. (Schafrath Dep. 126:21-127:16.)   The evidence also shows that Prissert was aware of Plaintiff's poor performance at least as of September 16 when Prissert emailed Plaintiff "I am very concerned that you might not reach any of the goals, [*sic*] we set in January, (quantitative and qualitative) for your territory . . . We are running out of time." (Def.'s 56.1 Stmt. ¶ 81).

Third, Plaintiff provides no evidence that would allow a reasonable trier of fact to infer that he experienced disparate treatment based on his 2012 salary reduction.  A plaintiff relying on disparate treatment evidence to raise an inference of discrimination must show he was "similarly situated in all material respects" to the individual with whom he seeks to compare himself. *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir. 1997.)  Here, however, plaintiff fails to present any evidence regarding Cawthorne's 2012 territory reduction.

With regards to his termination, Plaintiff argues that Defendant's proffered reasons were a pretext for discrimination because "Plaintiff was replaced by a heterosexual man with no sales experience or any discernable qualifications . . . undermin[ing] any claim that Cargian's termination was because of his poor sales." (Pl.'s Opp. 15.)  However, Plaintiff presents no evidence that Prissert believed Schafrath would be unable to handle the position when he offered Schafrath promotion.  The uncontroverted evidence shows that Prissert thought that Schafrath's experience as a vault manager made him a good candidate because "he knew the brand very well

[and] he knew the product perfectly, which are two assets that are very important to be a good sales rep." (Schafrath Dep. 93:14-92:2.) Absent any evidence of discrimination, or any other compelling reason, courts will not reexamine a company's legitimate business decisions. *Faldetta v. Lockheed Martin Corp.,* 2000 WL 1682759, at *9-10 (S.D.N.Y. Nov. 9, 2000)(plaintiff's conclusory allegations that defendant's business reasons for terminating plaintiff were untrue are insufficient to defeat summary judgment).

Plaintiff has also failed to present evidence from which a reasonable juror could conclude that sexual orientation discrimination was either the true reason or a motivating factor in Plaintiff's adverse employment action. Plaintiff seems to argue that because he is homosexual and all of his colleagues were heterosexual, his employment action must have been due to his sexual orientation. (Pl.'s Opp. 13-19, 21-22.) However, Plaintiff's speculation that he suffered sexual orientation discrimination, absent any supporting facts, is insufficient to allow a reasonable juror to conclude that Defendant's true reason for Plaintiff's adverse employment action is discrimination. *See Paulose v. New York City Department of Education,* No. 05-9353, 2007, U.S. Dist. LEXIS 34146, at *29-30 (S.D.N.Y. 2007) (pretext not found where plaintiff fails to offer evidence that defendant took adverse employment action due to an invidious motive). Similarly, as Plaintiff has failed to present direct evidence of discrimination, he has not shown that discrimination was a motivating factor in either of his adverse employment action. *Raskin,* 125 F.3d at 66 (statements regarding plaintiff's protected class did not reflect discriminatory animus and was therefore insufficient to show discrimination was a motivating factor).[1]

---

[1] Plaintiff argues that summary judgment is also inappropriate because defendant exhibited discriminatory animus. (Pl.'s Opp. 21-22.) Specifically, Plaintiff asserts that the raising of his 2011 sales goal by 92% evinced discriminatory animus. However, Bodman was responsible for setting Plaintiff's 2011 goal, not Prissert. (Def.'s 56.1 Stmt. ¶ 97.) Next, Plaintiff asserts that Prissert's frequent conversations about sports in the office exhibited discriminatory animus towards Plaintiff. However, Plaintiff has failed to present any evidence that Prissert made remarks regarding Plaintiff's sexual orientation during these, or any,

Plaintiff has failed to present evidence from which a reasonable juror could conclude that Defendant's proffered reasons for Plaintiff's reduction in territory, salary, or termination were false or unworthy of credence. Plaintiff has also failed to present evidence that the true reason for Plaintiff's adverse employment action was sexual orientation discrimination, or that it was a motivating factor. Therefore, Plaintiff has failed to establish Defendant's reasons were a pretext for discriminatory motive and that Plaintiff was the victim of intentional discrimination. Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim for discrimination under Title VII and NYSHRL.

## IV.   DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR DISCRIMINATON UNDER NYCHRL

Under NYCHRL, it is an "unlawful discriminatory practice ... [f]or an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, ... partnership status, sexual orientation ... or alienage or citizenship status of any person, ... [t]o refuse to hire or employ or to bar or to discharge from

---

conversations. (*Id.* ¶ 148.) Third, Plaintiff asserts that being assigned to share a hotel room with Anne Sommer evinced discriminatory animus. However, Plaintiff and Ms. Sommer had voluntarily chosen to share rooms on some occasions. (*Id.* ¶ 141.) Moreover, Plaintiff emailed Breitling headquarters to request bigger room for him and Sommer, and stated that they had been sharing rooms at that conference for years. (*Id.*) Fourth, Plaintiff alleges that he was not invited to certain marketing events while other heterosexual male colleagues were invited. However, Plaintiff has failed to present evidence from which a reasonable finder of fact could conclude that he was excluded from the conferences because of his sexual orientation. (*Id.* ¶ 148.) Fifth, and finally, Plaintiff argues that he was treated less well than male heterosexual sales representatives with regards to decrease in salary, Patrick Cawthorne, and disciplinary measures, Brian Criddle. However, Plaintiff has failed to adduce any evidence from which a reasonable juror could conclude that Plaintiff and the two heterosexual male representatives he wishes to compare himself to were similarly situated to Plaintiff. (*See infra* III.C.) As Plaintiff has failed to present evidence in support of its allegation that Defendant exhibited animus towards Plaintiff as a gay man, Plaintiff has failed to show discriminatory animus. *Golden Pac. Bancorp v. FDIC,* 375 F.3d 196, 200 (2d Cir. 2004) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful") (quoting *D'Amico v. City of N.Y.,* 132 F.3d 145, 149 (2d Cir. 1998); *Moccio v. Cornell University,* 889 F. Supp. 2d 539, 528 (S.D.N.Y. 2012) (observing that conclusory allegations are not enough to support an inference of discrimination).

employment such person; or [t]o discriminate against such person in compensation or in terms, conditions or privileges of employment." New York City, N.Y., Code § 8-107, New York City, N.Y., Code § 8-107(a)(2)-(3). To defeat summary judgment, "plaintiff need only show differential treatment—that she is treated 'less well'—because of a discriminatory intent." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d at 110. Summary judgment is proper "only if the record establishes as a matter of law that discrimination played no role in its actions." *Id.*

"[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims." *Mihalik*, 715 F.3d 102, 109 (2d Cir. 2013). "[E]ven if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." *Id.* Claims under the NYCHRL are construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Williams v. New York City Transit Auth.*, 171 A.D.3d 990, 992 (2019). However, NYCHRL is not a general civility code, and "petty slights or trivial inconveniences ... are not actionable." *Id.* The burden remains on the plaintiff to show "that the conduct is caused by a discriminatory motive." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) "[S]he must show that she has been treated less well at least in part "'because of her gender.'" *Id.* (emphasis in original). Plaintiff fails to show that he was treated less well than any similarly situated colleague outside his protected class.

Plaintiff fails to present any evidence that he was similarly situated to the colleagues he seeks to be compared with. Therefore, a reasonable juror would not be able to infer that he was treated less well because of his sexual orientation. *See Shapiro v. City of New York*, No. 13 (CIV) 8647 (DLC), 2015 WL 4002437, at *8 (S.D.N.Y. July 1, 2015), aff'd, 649 F. App'x 71 (2d Cir. 2016) (granting summary judgment where plaintiff failed to present evidence showing that the

plaintiff and his purported comparators were "subject to the same standard of performance and discipline," and "engaged in comparable conduct"). Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim for discrimination under NYCHRL.

## V.    CONCLUSION

Defendant's Renewed Motion for Summary Judgment, (ECF No. 84), is GRANTED. The Clerk of Court is directed to close the motions accordingly and to close this case.

Dated: New York, New York
     September ___ SEP 1 3 2021

                                          SO ORDERED.

                                          *George B. Daniels*

                                          GEORGE B. DANIELS
                                          United States District Judge